Obadyah BEN–YISRAYL, f/k/a Christopher Peterson, Appellant (Petitioner Below),

v.

STATE of Indiana, Appellee (Respondent Below).

No. 64S00–9808–PD–429.

Supreme Court of Indiana.

Aug. 28, 2001.

Susan K. Carpenter, Public Defender of Indiana, Steven H. Schutte, Deputy Public Defender, Emily Mills Hawk, Deputy Public Defender, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SHEPARD, Chief Justice.

Obadyah Ben–Yisrayl sits on Death Row after committing four murders. After his appeal in the two killings involved in this case, he sought post-conviction relief, unsuccessfully. We have spent considerable time examining his most energetic contention—that the transcript of his trial is in such deplorable shape that the case should be tried anew. We affirm the post-conviction court's denial of relief.

Formerly known as Christopher D. Peterson, Ben–Yisrayl was sentenced to death after being convicted of two counts of murder and two counts of felony murder for killing Harchand Dhaliwal and Marie Meitzler in Portage, Indiana. We affirmed his convictions and sentence on direct appeal. *Ben–Yisrayl v. State,* 690 N.E.2d 1141 (Ind.1997), *cert. denied,* 525 U.S. 1108, 119 S.Ct. 877, 142 L.Ed.2d 777 (1999). In this appeal from the denial of his petition for post-conviction relief, he raises several issues, which we restate as:

I. Whether the post-conviction court properly excluded polygraph evidence;

II. Whether his appellate lawyer was ineffective;

III. Whether his trial counsel rendered ineffective assistance;

IV. Whether the post-conviction court properly admitted evidence of George and Ilija Balovski's murders and the shotgun found in Ben–Yisrayl's closet;

V. Whether certain procedural rulings of the post-conviction court were erroneous; and

VI. Whether the trial transcript was so inadequate as to deny Ben–Yisrayl due process or meaningful appellate and collateral review.

## Facts and Procedural History

On the evening of December 13, 1990, Harchand Dhaliwal was killed by a shotgun wound to the head while working as a gas station attendant in Portage, Indiana. About $327 was missing from the station. Two days later, Marie Meitzler was also killed by a shotgun wound to the neck while working as a motel clerk, not far from the gas station. The motel's cash register was missing about $467.

On December 18, 1990, Ilija (Eli) and George Balovski were each killed by gunshot wounds to the head while working at their tailor shop in Gary, Indiana. *Ben–Yisrayl v. State,* 729 N.E.2d 102, 105 (Ind. 2000).

Portage police officers recovered from Ben–Yisrayl's apartment a sawed-off shotgun that was later determined to have

fired a shell casing involved in the Balovski shootings. After he was arrested, Ben–Yisrayl gave a formal statement to the police admitting each of these murders.

### Post–Conviction Standard of Review

■ As we have often explained, post-conviction proceedings are not intended and will not operate as a "super-appeal" for the convicted. *See Langley v. State,* 256 Ind. 199, 203, 210, 267 N.E.2d 538, 540, 544 (1971); *Weatherford v. State,* 619 N.E.2d 915, 916 (Ind.1993). Rather, these proceedings provide a narrower remedy for subsequent collateral challenges to convictions. *Weatherford,* 619 N.E.2d at 916–17. A petitioner has the burden to establish grounds for relief by a preponderance of the evidence. Ind. Post–Conviction Rule 1(5).

■ On appeal of the denial of post-conviction relief, a petitioner "stands in the position of one appealing from a negative judgment." *Fleenor v. State,* 622 N.E.2d 140, 142 (Ind.1993), *cert. denied,* 513 U.S. 999, 115 S.Ct. 507, 130 L.Ed.2d 415 (1994). Consequently, the appellate court considers only the evidence and reasonable inferences from such evidence that support the prior judgment. *Weatherford,* 619 N.E.2d at 917. "To prevail ... the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite to that reached by the trial court." *Id.* (citing *Williams v. State,* 508 N.E.2d 1264 (Ind.1987)).

### I. The Belated Polygraph Exam

■ Ben–Yisrayl says the post-conviction court infringed upon his constitutional right to present a defense by refusing to consider evidence that he passed a polygraph examination in 1999, almost nine years after the crimes occurred.[1] (Appellant's Br. at 9, 21; P–C.R. at 564–66, 607–09.)

We rejected an argument similar to Ben–Yisrayl's in *Wallace v. State,* 553 N.E.2d 456 (Ind.1990), *cert. denied,* 500 U.S. 948, 111 S.Ct. 2250, 114 L.Ed.2d 491 (1991). The debate over admissibility of polygraph evidence has continued in intervening years. The U.S. Supreme Court recently revisited the reliability of polygraph testing in a case challenging the constitutionality of a military rule making polygraph evidence inadmissible per se in court-martial proceedings. *United States v. Scheffer,* 523 U.S. 303, 305, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). The Court concluded: "[T]here is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques." *Id.* at 309, 118 S.Ct. 1261 (citations omitted). A per se exclusionary rule therefore did not infringe upon the accused's federal constitutional right to present a defense. *Id.* at 317, 118 S.Ct. 1261.

■ In focusing on the argument that polygraph evidence should be admitted because it is reliable, Ben–Yisrayl overlooks another formidable evidentiary hurdle. He offers his polygraph results to prove that he spoke truly when telling the examiner, "No," he had not killed "any of these people." (P–C.R. at 580.) But out-of-court statements offered to prove the truth of the assertion are inadmissible hearsay. Indiana Rule of Evidence 801(c). Even well-respected proponents of polygraph evidence have conceded that the type of evidence Ben–Yisrayl offers "argu-

---

1. Ben–Yisrayl cites other state and federal constitutional provisions but offers specific arguments only on the right of a defendant to present a defense under the Sixth and Four-teenth Amendments to the U.S. Constitution and Ind. Const. art. I, § 13. His other constitutional claims are therefore waived under Ind. Appellate Rule 8.3(A)(7).

ably violates the spirit of the hearsay rule" because "the foremost rationale for the rule is safeguarding the right to cross-examine adverse witnesses." Edward J. Imwinkelried & James R. McCall, *Issues Once Moot: The Other Evidentiary Objections to the Admission of Exculpatory Polygraph Examinations*, 32 Wake Forest L.Rev. 1045, 1064 (1997).

■ Ben–Yisrayl cannot overcome the prohibition against hearsay evidence by offering the polygraph to bolster his credibility rather than for the truth of the matter asserted, because he has avoided impeachment throughout this case by declining to testify. The post-conviction court did not err in refusing to admit the polygraph operator's view about the veracity of such out-of-court statements.

## II. Was Ben–Yisrayl's Appellate Lawyer Ineffective?

Ben–Yisrayl says his appellate lawyer should have argued that his death sentence violated the U.S. Constitution because "literally no evidence supports it." (Appellant's Br. at 23.) This contention refers to the fact that during the penalty phase of Ben–Yisrayl's trial, the State presented no new evidence but specifically asked the jury to consider all the evidence presented to them during the guilt phase, as provided in Ind.Code § 35–50–2–9(d).[2]

In his direct appeal, Ben–Yisrayl argued that the State had not offered any evidence of a statutory aggravating circumstance during the penalty phase, and thus had failed to prove the existence of an aggravator beyond a reasonable doubt. *See* Ind.Code Ann. § 35–50–2–9(a) (West 1993),[3] *Ben–Yisrayl*, 690 N.E.2d at 1151. We held that the Indiana Code did not require that a prosecutor formally move to incorporate the guilt phase evidence at the penalty phase in order to satisfy the State's burden of proof during the penalty phase and that the evidence was thus before the jury for consideration in recommending for or against death. *Ben–Yisrayl*, 690 N.E.2d at 1152.

Ben–Yisrayl now raises the issue of the State's reliance on guilt phase evidence during the sentencing phase as a federal constitutional claim.[4] He asserts that his appellate counsel was ineffective for failing to argue on direct appeal that the penalty phase of Ben–Yisrayl's trial violated several of his federal constitutional rights.[5] (Appellant's Br. at 25, citing T.R. at 1477).

2. In a sentencing hearing, "The jury or the court may consider all the evidence introduced at the trial stage of the proceedings, together with new evidence presented at the sentencing hearing." Ind.Code Ann. § 35–50–2–9(d) (West 1993).

3. "In the sentencing hearing after a person is convicted of murder, the state must prove beyond a reasonable doubt the existence of at least one (1) of the aggravating circumstances alleged." Ind.Code Ann. § 35–50–2–9(a) (West 1993).

4. Specifically, Ben–Yisrayl claims that the jury's reliance on the evidence presented in the guilt phase of trial to make its determination regarding the death penalty violated his

(1) Fourteenth Amendment right to due process for failing to follow the proper procedure for an Indiana penalty trial; (2) Sixth and Eighth Amendment rights to the protection provided by a bifurcated proceeding; and (3) Sixth Amendment right to have a jury decide beyond a reasonable doubt from "facts properly before the jury." (Appellant's Br. at 24–26.)

5. When Ben–Yisrayl's appellate counsel, Gary S. Germann, was questioned during Ben–Yisrayl's post-conviction hearing as to why he did not raise a federal constitutional claim regarding the jury's death sentence determination, German responded, "I did not consider it a United States Constitutional issue at the time." (P–C.R. at 1477.)

Each of these contentions flows from his assertion that the State "made no request that the guilt-trial evidence be incorporated into the penalty-trial [ ]," (Appellant's Br. at 25), and that his lawyer was deficient for not arguing the point.

We held during Ben–Yisrayl's direct appeal that in the penalty phase of trial the jury may consider all the evidence introduced at the trial stage of the proceedings[6] whether the State requested incorporation of the guilt phase evidence into the penalty phase or not.[7] That being the state of Indiana law, his lawyer was not deficient by taking a pass on federal arguments that rest on our law being otherwise.

### III. Trial Counsel Effectiveness

■ *A. On Jury Instructions.* Ben–Yisrayl claims that his trial counsel was ineffective for failing to argue that the word "arises" in a reasonable doubt instruction impermissibly shifted the burden of proof at the guilt phase of his trial.[8] (Appellant's Br. at 28–30). He also claims ineffective assistance for failure to challenge a presumption-of-truthfulness instruction.[9] *Id.* at 30–32. He concedes that we rejected these same arguments in his post-conviction challenge to his convictions and death sentences for killing the Balovski brothers. *Ben–Yisrayl v. State,* 729 N.E.2d at 111–12; (Appellant's Br. at 27 n. 3). Our conclusion is the same here: counsel did not fall below an objectively reasonable performance for failing to challenge these instructions. *See Ben–Yisrayl,* 729 N.E.2d at 111–12.

*B. Exclusion of Jurors.* Ben–Yisrayl claims that the post-conviction court violated his federal and state constitutional rights when it refused to admit affidavits by two prospective jurors who were dismissed because they said they could not vote to impose the death penalty under any circumstances. (Appellant's Br. at 47–54; T.R. at 1374, 1394–95.) The affidavits stated that these individuals opposed the death penalty as a matter of conscience. (P–C.R. at 1713, 1716.)

■ A venireman "who express[es] conscientious objections to capital punishment" may be excluded for cause if his views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 416, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (citation omitted). *See also Fleenor v. State,* 514 N.E.2d 80 (Ind. 1987), *cert. denied,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988) (exclusion of jurors who cannot conscientiously consider the death penalty does not deny defendant a fair trial).

Ben–Yisrayl argues that such exclusion is a form of religious discrimination, and he invokes case law dealing with racially discriminatory juror strikes. (Appellant's Br. at 48–50.) We have held, however, that precedent barring the racially discriminatory use of peremptory challenges

---

6. *See* Ind.Code Ann. § 35–50–2–9(d) (West 1993).

7. *Ben–Yisrayl,* 690 N.E.2d at 1151–52.

8. The challenged instruction defined reasonable doubt as "a fair, actual, and logical doubt that arises in your mind after an impartial consideration of all the evidence and circumstances in the case." (T.R. 2nd Supp. at 13.)

9. This instruction told jurors to "attempt to fit the evidence to the presumption that the defendant is innocent and the theory that every witness is telling the truth." (T.R. 2nd Supp. at 3.) The same instruction told jurors, "In considering the testimony of any witness, you may take into account ... any interest, bias or prejudice the witness may have...." (*Id.*)

does not preclude the exclusion of prospective jurors who would not recommend the death penalty under any circumstances. *Lambert v. State*, 643 N.E.2d 349, 352 (Ind.1994).

▮▮▮▮▮▮ Ben–Yisrayl also claims that Ind.Code Ann. § 35–37–1–5(a)(3) (West 1991) [10] violates the equal privileges clause of the Indiana Constitution.[11] (Appellant's Br. at 51.) To pass constitutional muster, differential statutory treatment must be reasonably related to inherent characteristics that distinguish the unequally treated class. *Collins v. Day*, 644 N.E.2d 72, 80 (Ind.1994). Here, it is plainly reasonable to exclude prospective jurors in capital cases who are so inherently opposed to the death penalty that they could not recommend a death sentence regardless of the facts or the law. A second prong of the constitutional requirement is that the differential treatment must apply equally to all those similarly situated. *Id.* This statute treats all jurors who express such convictions, for whatever reason, the same.

A lawyer who did not raise these various challenges to the prevailing rule of a "death-qualified jury" would be well within the standard of performance required by the Sixth Amendment. The post-conviction court appropriately rejected Ben–Yis-

rayl's contentions about the effectiveness of his trial counsel.

## IV. Admissibility of Evidence at Trial

▮▮▮▮ *A. The Balovski Murders.* Ben–Yisrayl argues that the trial court improperly admitted evidence that Ben–Yisrayl murdered George and Ilija Balovski. (Appellant's Br. at 33.) As Ben–Yisrayl concedes, this issue was raised in his direct appeal and resolved against him.[12] The decision on that issue is res judicata. *See Sweeney v. State*, 704 N.E.2d 86 (Ind. 1998), *cert. denied*, 527 U.S. 1035, 119 S.Ct. 2393, 144 L.Ed.2d 793 (1999).

*B. The Shotgun.* Ben–Yisrayl next argues that the shotgun found in his mother's apartment was illegally seized and therefore improperly admitted into evidence at trial because there was no probable cause to believe that it was contraband. (Appellant's Br. at 44–46.) He bases this claim on an assertion that the shotgun, which was twenty-six and a half inches, with a sixteen or sixteen and a half inch barrel, was not "sawed-off." (Appellant's Br. at 46); *See Ben–Yisrayl*, 729 N.E.2d at 110.

We have visited this shotgun issue before. In *Ben–Yisrayl v. State*, 729 N.E.2d at 109–10, Ben–Yisrayl claimed, as he does here, that the shotgun was not a "sawed-off" shotgun,[13] as defined by Ind.Code § 35–47–1–10.[14] We rejected this argu-

---

10. This statute lists various "good causes" for challenging a prospective juror in a criminal trial. Under § 5(a)(3), cause arises in a capital case "[i]f ... the person entertains such conscientious opinions as would preclude the person from recommending that the death penalty be imposed."

11. Ind. Const. art. I, § 23 says: "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens."

12. We held, "[E]ven if the evidence was erroneously admitted, which we do not decide,

such error would be harmless." *Ben–Yisrayl*, 690 N.E.2d at 1147.

13. Ind.Code Ann. § 35–47–5–4.1 (West 1990) criminalizes the possession of a sawed-off shotgun.

14. Ind.Code Ann. § 35–47–1–10 (West 1990) defines a "sawed-off" shotgun as "having one (1) or more barrels less than eighteen (18) inches in length; and (2) any weapon made from a shotgun ... if the weapon as modified has an overall length of less than twenty-six (26) inches."

ment while affirming that the statute defining a "sawed-off" shotgun should be interpreted disjunctively. *Id.* at 110. These two claims are barred.

## V. Post–Conviction Procedural Rulings

■ Ben–Yisrayl asserts that the post-conviction court denied him the right to full and fair litigation at his post-conviction hearing when the court "refused to assist Ben–Yisrayl in securing additional relevant information possessed by the government." (Appellant's Br. at 54.) Ben–Yisrayl claims that access to information regarding the relationship between Ivory Maxwell, a State's witness, and Mark Becker, a Special Agent with the Federal Bureau of Investigation, was "crucial to a reliable outcome in this case." We conclude it was not.

■ In *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the U.S. Supreme Court held, "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." We have

previously recognized that this holding applies to evidence impeaching the credibility of a State's witness. *See Williams v. State,* 714 N.E.2d 644 (Ind.1999), *cert. denied,* 528 U.S. 1170, 120 S.Ct. 1195, 145 L.Ed.2d 1099 (2000) (citing *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375.

Ben–Yisrayl sought the additional evidence concerning the relationship between Maxwell and Becker to show that Maxwell was a paid confidential informant in Ben–Yisrayl's case and to discredit Maxwell's testimony. (*See* Appellant's Br. at 56). After examining the content of Maxwell's testimony and the effectiveness of defense counsel's cross-examinations, the post-conviction court found that the evidence that Ben–Yisrayl sought was not material.[15] The court said,

---

15. The post-conviction court's findings included:

Maxwell's testimony was that he had seen the shotgun alleged to be the murder weapon at Petitioner's residence (R. 4343–44), that he had seen Petitioner handle the shotgun "a couple of times" (R. 4345), and that while handling the shotgun Petitioner had said that "he had did some damage with it" (R. 4345). Maxwell stated that in his statement to the FBI on February 7, 1991, he told the FBI that Petitioner had said "he did some damage with it" (R. 4347). On cross-examination, defense counsel elicited that in his deposition, Maxwell had said he saw Petitioner with the shotgun once, and hadn't actually seen Petitioner in physical possession of the shotgun, but that it was on Petitioner's bed (R. 4354–56). Counsel also elicited from Maxwell that in his depo-

sition he had said that the only conversation about the shotgun was that Petitioner had said that he had just shot a hole in the mattress when Maxwell and McGee walked in, and hadn't said anything about doing damage with the shotgun (R. 4359–60, 4361, 4363, 4364). Finally, defense counsel elicited that Petitioner never told Maxwell that he (Petitioner) was involved in either the tailor shop murders in Gary or either of the two murders charged in this case, the Hudson Oil murder or the Howard Johnson's murder (R. 4371–72). On recross examination, counsel got Maxwell to agree that he "didn't indicate that Chris said he had done some damage with it, just that this baby here has done some damage" (R. 4378).

(P–C.R. at 1077–78.)

It is clear that counsel conducted a very thorough cross-examination of Maxwell, got him to admit some inconsistencies between his testimony and his previous statements, and even got Maxwell to suggest the Petitioner's alleged statement about the shotgun might not be an admission that Petitioner had done some damage with the shot gun ... It is hard to see how information as to Maxwell's alleged cooperation with law enforcement would have added much to the effect of the cross-examination.... There is simply no reasonable probability that the allegedly impeaching information would have led to a different result.

(P–C.R. at 1077–78.)

Ben–Yisrayl has failed to show that the evidence leads unerringly and unmistakably to an opposite conclusion. Consequently, we will not disturb the post-conviction court's ruling.

■ Ben–Yisrayl next contends that the post-conviction court erred when it denied his request for transcripts from the jury selection in his earlier trial on these charges, which ended in a mistrial. (Appellant's Br. at 56.) He asserts this information is necessary and relevant "to discover whether the misconduct in jury selection presaged the alleged misconduct in closing argument." (Appellant's Br. at 57.) We disagree.

The mistrial occurred with the first attempt to impanel a jury for Ben–Yisrayl's trial based on an improper comment by the prosecutor. (P–C.R. at 1214–16.) Ben–Yisrayl moved for a second mistrial during closing argument claiming that the prosecutor committed reversible error when he challenged defense counsel to explain why a person would voluntarily confess to a crime that he did not commit. *Ben–Yisrayl,* 690 N.E.2d at 1148–49.

The trial court denied this motion and on direct appeal we determined that the prosecutor's statement could not have reasonably been interpreted by the jury as a suggestion to infer guilt from the defendant's silence. *Id.* at 1149. We determined that the trial court did not abuse its discretion by refusing to grant a mistrial because doing so did not subject Ben–Yisrayl to grave peril. *Id.*

In his post-conviction proceeding, Ben–Yisrayl sought to establish a pattern of prosecutorial misconduct by linking the prosecutor's improper comments from the mistrial with those made at closing argument. (P–C.R. at 1214.) The post-conviction court observed that the statements from the mistrial were made to an entirely different jury and were dissimilar to those made at closing argument. (P–C.R. at 1213.) The court characterized Ben–Yisrayl's request for the discovery of the transcripts from the jury selection of the mistrial as a "fishing expedition." (P–C.R. at 1218.) We agree. Any error that occurred in the first proceeding was remedied when the court declared a mistrial.

## VI. An Imperfect But Sufficient Record

Ben–Yisrayl argues vigorously that errors and omissions in the record entitle him to a new trial. (Appellant's Br. at 58.) After careful scrutiny of the record, we disagree.

*Background.* The trial record in this case has been problematic from the start. The court reporter abandoned the project of transcribing her stenographic discs before the work was halfway done, and another reporter took over the job. (P–C.R. at 2705–06.) The new reporter encountered difficulty deciphering many passages, and a record reconstruction specialist from Washington State stepped in to assist. (*Id.*) Other scopists and proofreaders also helped, using both the discs

and audiotapes of the trial. (P–C.R. Supp. at 8, 11, 13, 22, 31.) Because of the transcription problems, we granted Ben–Yisrayl five extensions of time to file a record for appeal. (P–C.R. at 2684, 2693, 2702, 2710, 2718.)

On August 25, 1994, when the record had finally been compiled, Ben–Yisrayl filed a motion asking this Court for a new trial based on its remaining gaps and errors. *Ben–Yisrayl*, 690 N.E.2d at 1146. We denied the motion. *Id.* Although Ind. Crim. Rule 5 calls for reporting "all oral evidence and testimony given in all cases and hearings, including both questions and answers, all rulings of the judge in respect to the admission and rejection of evidence and objections thereto, and any other oral matters occurring during the hearing in any proceeding," Ind. Appellate Rule 7.2(C)(2) says: "Incompleteness or inadequacy of the record shall not constitute a ground for dismissal of the appeal or preclude review on the merits." On October 6, 1994, we issued the following order to supplement the record in accordance with App. R. 7.2(C):

> The trial court judge, deputy prosecutor and defense counsel who participated in Appellant's trial in this cause shall, to the best of their abilities, reconstruct the actual testimony or arguments not accurately depicted in the trial transcript filed in this Court. To the extent that such testimony cannot be reconstructed, the trial court judge, deputy prosecutor and defense counsel shall report in writing the thrust of the inaccurately transcribed testimony or arguments to the best of their recollection. To the extent that their memories of the actual testimony or arguments are inadequate to reconstruct or outline the testimony or arguments, the trial judge, deputy prosecutor and defense counsel

> shall report in writing to this Court whether such testimony or arguments raise any material issue or relate to any error raised in Appellant's motion to correct errors.

*Ben–Yisrayl*, 690 N.E.2d at 1146 (quoting Indiana Supreme Court Order dated Oct. 6, 1994). The results were due to us by February 1, 1995. *Id.* We stayed briefing in the interim. *Id.*

The trial judge, deputy prosecutor, and trial defense attorneys met as ordered to fill in the holes in the record. (P–C.R. at 358–416.) After nearly four days going over the individual errors and omissions cited by appellate counsel, the State and defense each briefed the few passages on which they could not reach consensus. (*Id.*, P–C.R. at 2827, 2840.) The judge reviewed the briefs and adopted the State's version of three passages, found two issues duplicative of issues previously briefed, and deemed the final passage immaterial. (P–C.R. Supp. at 36–37.)

Ben–Yisrayl's appellate counsel did not report any remaining record deficiencies to us as our order required. Nonetheless, Ben–Yisrayl argued on appeal that the record of the pretrial hearing and voir dire was inadequate to permit review of the change of venue issue. *Ben–Yisrayl*, 690 N.E.2d at 1147 n. 14. Although the claim was forfeited, we addressed it and determined that the flaws in the record could not have been material to the issue of the trial venue. *Id.* at n. 14.

*The Post–Conviction Claim.* Ben–Yisrayl now points out numerous additional errors and omissions in the record that appellate counsel failed to identify. He argues that his appellate counsel was ineffective in waiving review of the overall adequacy of the record.[16] He also argues

---

**16.** Alternatively, he argues that he was con-
structively denied the assistance of counsel

that the flaws in the record denied him due process and the right to meaningful appellate and collateral review. (Appellant's Br. at 58.) In a nutshell, he asks us to find that indecipherable portions of the record raise material issues, and therefore to grant him a new trial without requiring him to make specific allegations of error. See Ben–Yisrayl, 690 N.E.2d at 1147 n. 14.

The State does not deny that a transcript may sometimes be so deficient as to justify a new trial, but maintains that the post-conviction court correctly concluded that the record as supplemented in this case is adequate. (Appellee's Br. at 18, P–C.R. at 1083–84.) See Gallagher v. State, 274 Ind. 235, 410 N.E.2d 1290, 1292 (1980) ("[A] new trial is an appropriate remedy where there is no usable transcript available for appeal.") (emphasis added). See also State v. Perry, 136 Wis.2d 92, 401 N.W.2d 748, 752 (1987) (retrial may be required "in the event that the transcript is so deficient that there cannot be a meaningful appeal" but "not all deficiencies in the record nor all inaccuracies require a new trial.").

We have pored over this record in detail, bearing in mind that a man's life is at stake.

Two law clerks have each read all five thousand pages of the trial record. This author has read hundreds of pages of transcript, focusing especially on pages identified by Ben–Yisrayl and by the law clerks as particularly problematic. Other members of the Court have seen transcript as part of their review of the case.

Ben–Yisrayl presented the post-conviction court with a sixty-one page list of "errors" that he claims were not addressed on direct appeal. (P–C.R. at 461–523.) Nearly twenty-two pages cover the change of venue hearing, which (as noted above) was in fact addressed on direct appeal. Ben–Yisrayl, 690 N.E.2d at 1147 n. 14, (P–C.R. at 489–510). A fair number of the "errors" listed on the remaining pages are trivial. For example, many (including one entire page of the list, (P–C.R. at 483)) are simple misspellings, such as "ajoining," (P–C.R. at 484), and "imunity," (P–C.R. at 487).[17]

Others, however, are more substantial. We have grouped the latter into three categories, and address each in turn.

▪ *Unrecorded Bench Conferences.* Most of the bench conferences during trial were not recorded. (See, e.g., T.R. at 2093, 2668, 3361, 4322.) This omission would certainly make it unreasonable to require Ben–Yisrayl to show that any particular allegation of error was preserved by objection and proper argument, and we do not do so. It is not unreasonable, however, to require Ben–Yisrayl to articulate some

altogether, citing Penson v. Ohio, 488 U.S. 75, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988) (defendant was denied the assistance of counsel when his appointed appellate attorney withdrew after filing a conclusory statement that the defendant had no meritorious claims, and the court refused to appoint replacement counsel). The facts here are not analogous, and we analyze Ben–Yisrayl's ineffectiveness claim under the usual Strickland standard.

17. Others include capitalization errors (such as failing to capitalize the word "State," (P–C.R. at 480)), spacing errors (such as failing to insert a space between "speaking" and "with," (P–C.R. at 480)), and other trivial oversights (such as failing to insert "the" in the court's instruction to a witness "Please be seated in [the] chair there, ma'am," (P–C.R. at 486)). On some occasions, the record misidentifies a speaker or characterizes the continuation of a question as an answer, but in those cases the error and the appropriate correction are apparent, as shown by the fact that Ben–Yisrayl's errata listing indicates what obviously happened. (See, e.g., P–C.R. at 462, 466, 478.) Several errors are listed twice. (P–C.R. at 464–65, 482–83.)

plausible way in which he was harmed by the lack of record of bench conferences. *See, e.g., Jones v. District Court,* 780 P.2d 526, 529–30 n. 7 (Colo.1989) (mandamus action; state law and rules of court required a record of bench conferences but any failure to record all trial proceedings is subject to fact-specific harmless error analysis).

Here, the issue that triggered each bench conference can be ascertained from the record. We know when objections occurred, and how the court ruled. We also consider the fact that one of Ben–Yisrayl's appellate attorneys served as co-counsel at trial, and was presumably familiar with the issues raised and argued in sidebars. *See Hardy v. United States,* 375 U.S. 277, 84 S.Ct. 424, 11 L.Ed.2d 331 (1964) (holding that court-appointed trial counsel who also represents the indigent defendant on appeal gets at least the transcript relevant to the points of error assigned; if new counsel represents the indigent on appeal, the entire transcript is required).

The lack of bench conference records certainly suggests that a reviewing court should take an appropriately liberal approach to issues that might otherwise be considered waived at trial for lack of either objection or argument. It also justifies giving Ben–Yisrayl the benefit of the doubt in speculating about what may have been discussed during any of the unrecorded sidebars. It does not, however, relieve Ben–Yisrayl entirely of his obligation to make issue-specific claims of error. *See* App. R. 8.3(A)(7).

■ *The Suppression Hearing.* By brief, (T.R. at 528, 536), and at a pretrial hearing, (T.R. 2nd Supp. at 188, 328), Ben–Yisrayl argued that his confessions should be suppressed because his arrest was not supported by probable cause. The court rejected this argument. *Ben–Yisrayl,* 690 N.E.2d at 1152. On direct appeal Ben–Yisrayl again claimed that his confessions were the fruit of an illegal arrest. *Id.* He did not argue that the gaps in the record precluded meaningful review of this claim. We addressed the issue on the merits and rejected his argument. *Id.*

In his post-conviction claim, Ben–Yisrayl points to numerous "undecipherables" in the 158–page suppression hearing transcript in partial support of his overall claim that the trial record is materially deficient. (T.R. 2nd Supp. at 188–346; P–C.R. at 512–23.) We implicitly rejected this argument on direct appeal when we considered and rejected his suppression argument on the merits.[18]

We have revisited the suppression hearing record in light of Ben–Yisrayl's lengthy post-conviction list of record errors. Many of the "undecipherables" are on topics that are extraneous, such as preliminaries on the hearing mechanics, (*see, e.g.,* P–C.R. 2nd Supp. at 189–90), formalities preceding summary arguments, (*see, e.g., id.* at 305, 330), an objection by the State that was overruled, (*see id.* at 250–51), and the court's explanation for telling defense counsel to rephrase a leading question (*see id.* at 252). Others are responses to questions, where a follow-up question makes clear what the substance of the response was.[19] (*See, e.g., id.* at 234–35, 237–40, 247–48, 254–55, 260, 264, 268, 282.)

---

**18.** We were aided in arriving at this determination by the fact that Ben–Yisrayl had raised an identical claim when he appealed his convictions for the Balovski murders. *Ben–Yisrayl,* 690 N.E.2d at 1152. His factual allegations and argument were the same. *Id.*

**19.** One example is the question, "So, you took them to three other locations?" (P–C.R. 2nd Supp. at 260.) Ben–Yisrayl lists as error the fact that the answer is "(Undecipherable)." (*Id.*) What he does not add is that the next question is prefaced, "Two more, alright...." (*Id.*)

Although there are passages that contain more serious flaws, we again conclude that these gaps, viewed in an overall context, are not severe enough to relieve Ben–Yisrayl of his burden of making specific claims of error. Based on the state of the record we would not penalize him by treating any substantive suppression arguments as waived for failure to cite where the issue was raised and preserved at trial. The flaws in the record are not material, however, and we stand by our previous implicit conclusion that the record regarding the suppression claim is sufficient.

■ *Other Miscellaneous Errors and Omissions.* A number of brief passages during voir dire and witness testimony contain incoherent words or phrases. Some of these problems were resolved during the reconstruction meetings, in which both of Ben–Yisrayl's trial attorneys actively participated. (P–C.R. at 358–414.) At post-conviction, Ben–Yisrayl points to additional record deficiencies that appellate counsel failed to identify, plus a few that the reconstruction meetings failed to resolve.[20] (P–C.R. at 461–88.)

Each entry on Ben–Yisrayl's errata list must be viewed in the context of the surrounding record. In each instance the subject matter of the discussion is sufficiently obvious from the record preceding and following the cited deficiency to allow specific claims of error. Again, we find no material defect(s) in the record.

*Summary.* Trial records are rarely if ever perfect, and this record is far from the best. We conclude, however, that none of the errors and omissions raise material issues. Ben–Yisrayl's appellate

counsel was therefore not ineffective for failing to challenge the overall sufficiency of the record, and Ben–Yisrayl has received due process, including meaningful appellate and collateral review.

### Conclusion

We affirm the decision of the post-conviction court.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.

---

**20.** A very few errors or omissions listed by appellate counsel, all during voir dire, were not addressed because the list was off by one page. For example, the reconstruction meeting participants found "nothing material absent" on page 1201, lines eight and nine, which were cited in Ben–Yisrayl's errors list. (P–C.R. at 364.) They did not discuss illegible words in lines eight and nine of page 1200. (*Id.*) They soon figured out the discrepancy and adjusted the page numbers shown on the list as they went along. (P–C.R. at 365–66.)