## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 12 2019, 7:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Linda L. Harris
Kentland, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Scottie M. Kincade,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

September 12, 2019

Court of Appeals Case No.
18A-CR-655

Appeal from the Warren Circuit
Court

The Honorable Hunter J. Reece,
Judge

Trial Court Cause No.
86C01-1609-MR-32

**Mathias, Judge.**

[1]     Following a jury trial in Warren Circuit Court, Scottie M. Kincade ("Kincade") was convicted of murder and Level 4 felony arson. Kincade appeals and

presents two issues, which we restate as: (1) whether the trial court committed reversible error by failing to ensure that bench conferences were recorded, and (2) whether the trial court abused its discretion by admitting evidence of Kincade's violent relationship with the victim.

We affirm.

## Facts and Procedural History

Kincade had been in an "on again/off again" romantic relationship with the victim in this case, Heather Smith ("Smith"), for approximately twenty years. Tr. Vol. 4, p. 123. The couple had three children together: S.M.K., E.J.K., and M.N.K, who were respectively twelve, ten, and five years old at the time of their mother's death. Smith and Kincade's relationship was violent and combative. Smith went to her mother's house "beat up" several times. Tr. Vol. 4, p. 98. In 2011, Kincade threatened to burn down Smith's grandmother's house when Smith was temporarily residing there. He also once told a friend that he "could get away with murder in this county." Tr. Vol. 3, p. 135. Smith and Kincade's oldest child, S.M.K., stated that his parents' relationship was "horrible," and that they constantly fought and struck each other. Disturbingly, Kincade told S.M.K. that the child would "never be able to see her again so [S.M.K.] needed to tell [Smith] goodbye," because Kincade was going to "put [Smith] in a box and throw her in the river." Tr. Vol. 5, p. 231. He also told a friend shortly before the murder that he was going to "kill that bitch someday," referring to Smith. Tr. Vol. 3, p. 188.

[4] Smith obtained three different protective orders against Kincade over the years, and Kincade had been previously convicted of invasion of privacy for violating one of these protective orders. The most recent protective order was still in effect at the time of Smith's death in September 2016. The police responded to several domestic violence reports at the couple's home, including one in March 2016, at which time Smith appeared with a swollen lip and redness to her neck and chest. Kincade was arrested and charged with domestic battery as a result. In April 2016, Smith went to church with two black eyes and a busted lip. And the police responded to four additional reports of domestic violence at Smith's home within thirty days in the late summer of 2016.

[5] In August 2016, Smith was with a friend when Kincade called her over fifty times in less than one hour. Around that time, Smith also reported to her therapist that she was anxious because she was ending her relationship with Kincade and because she was scheduled to appear in court as a witness in the domestic battery case against Kincade.

[6] Also in the late summer of 2016, Smith contacted Bryant Ledbetter ("Ledbetter"), a man both she and Kincade had grown up with. Smith spoke with Ledbetter about visiting him in Kansas in December of that year. Shortly thereafter, Kincade and one of his children contacted Ledbetter and threatened him with harm if he continued to pursue a relationship with Smith. Ledbetter then told Smith that he did not want to have a relationship with her. Still, Smith filed a notice of her intent to relocate to Kansas with her and Kincade's

children.[1] After ending her relationship with Kincade,[2] Smith started dating other men. One of these men used the alias "Zach Stevens," and Smith planned to see him on September 27, 2016.

[7] Shortly after 8:00 a.m. in the morning of September 27, 2016, the SIM card in Kincade's phone was removed from the phone he typically used and placed in another phone. At approximately 12:45 p.m., the SIM card was put back into Kincade's phone. That morning, Kincade called Smith thirty-five times and sent her thirty text messages. Kincade made no calls to Smith after noon.

[8] At 12:19 p.m. that day, the Warren County Sheriff's Office received a call that there was a fire at Smith's home on Jackson Street in Williamsport, Indiana. A volunteer fireman for the Williamsport Fire Department heard the dispatch while at home near the location of the fire. He looked outside his window and saw smoke coming from Smith's house. He immediately drove to Smith's house and met Kincade's sister, Sandy, who informed him that Smith was inside the home. The volunteer determined that he was unable to safely enter the burning home without protective gear, so he left the scene to go to the fire station.

[9] Another neighbor, Richard Howe ("Howe"), saw black smoke coming from Smith's house as he returned home. Howe telephoned Kincade to let him know

---

[1] *See* Ind. Code § 31-17-2.2-1.

[2] S.M.K. testified that Smith had kicked Kincade out of the home in the weeks prior to her death.

that the house was on fire, and Kincade responded by saying that he was on his way to the house. When Kincade did not arrive, Howe telephoned him again, but Kincade never came to the scene of the fire. Sandy called Kincade to ask where he and Smith were. Kincade responded sarcastically, "[a]sk Zach," referring to the man Smith had planned to meet that day. Tr. Vol. 3, p. 240.

[10] Firefighters arrived on the scene and put out the fire. Arson investigator Timothy Murray ("Murray") from the Indiana State Fire Marshall's Office investigated the fire. Near a bedroom of the house, Murray found Smith's body lying supine on the floor. Smith's body was burned in most areas, except for parts of her shoulder blades and buttocks, which had been lying against the floor. The bedframe in the bedroom suffered from severe heat damage, and the burn pattern on the bedroom floor suggested that a flammable liquid had been used. Murray concluded that a fire accelerant had been poured on Smith's body, as the area of the wall next to her left thigh was unburned even though Smith's thigh had sustained severe burn injuries. Based on the portions of Smith's body that were not burned, which indicated that she had not moved during the fire, Murray concluded that Smith's body did not move when the accelerant was poured.

[11] Shortly after noon on the day of the fire, Kincade telephoned his brother, Steve Kincade ("Steve"), and told him that the house was on fire and that "[t]he bitch is in it." Tr. Vol. 4, p. 28. Kincade asked his brother to go to the school and speak to Kincade's children. Steve attempted to speak with the children at the school but was unable to do so. He then went to his family's home and found

shotgun shells strewn about the floor. One of Kincade's friends saw Kincade driving Smith's car shortly after noon on the day of the fire. Later that afternoon, Amanda Fields ("Fields"), who knew Smith, saw Kincade driving Smith's car in an erratic manner and at speeds upwards of eighty miles per hour. She telephoned the police to report Kincade's location.

[12] Indiana State Trooper Joshua Edwards ("Trooper Edwards"), who had been searching for Kincade in order to speak with him about Smith's death, responded to the report and located Kincade driving Smith's car. When Trooper Edwards activated his lights and siren, Kincade lost control of the car and sideswiped a truck. He then drove along the side of the road in a cornfield, turned into the cornfield for over one hundred yards, and came to a stop. Trooper Edwards approached the car, but Kincade had fled. Inside the car the police found a new lighter, a partially full can of gasoline, and shotgun shells. None of these items had been in Smith's car when she dropped her children off at school earlier in the day. The police searched the cornfield for Kincade but were unable to find him.

[13] At approximately 10:00 p.m. that night, local resident John Anderson ("Anderson") was on property belonging to his grandparents when he heard Kincade call his name. Anderson spoke to Kincade, and Kincade asked him to call someone to come pick him up. Anderson obliged and telephoned Kincade's sister. The next morning, Timothy Purcell ("Purcell") found Kincade sitting in

a chair at Purcell's home.[3] Purcell called the police and told them that Kincade was at his home. When the police arrived, Kincade attempted to leave out the back door. The police ordered Kincade to show his hands, but he ignored the order and went back inside. When the police entered through the back door, Kincade was holding a knife and had cut his wrists. The police then took Kincade into custody.

[14] A subsequent autopsy of Smith's body conducted by Dr. E. Allan Griggs ("Dr. Griggs") revealed that the cause of death was breathing super-heated air and the resulting lack of oxygen. Dr. Griggs had difficulty determining if Smith had suffered from any injuries before being burned, as the fire had damaged her body so severely. Another doctor, Dr. Thomas Sozio ("Dr. Sozio"), reviewed the autopsy and noted the lack of damage to Smith's airway, which he thought inconsistent with breathing super-heated air. Based on the amount of soot in Smith's airway, Dr. Sozio concluded that Smith was breathing shallowly—in medical terminology, having agonal respirations. Such breathing usually occurs only near the time of death. Therefore, Dr. Sozio believed that Smith had suffered injuries prior to the fire, but the amount of damage caused by the fire made him unable to determine the scope of any possible injuries.

---

[3] Purcell owned a local auto parts business where Kincade used to work and had known Kincade since he was a child. The two had a close relationship. Aware that the police were looking for Kincade, and apparently worried that Kincade might show up at his home, Purcell had spent the night at a friend's house. When he returned home, he found Kincade.

On September 30, 2016, the State charged Kincade with knowing or intentional murder, felony murder while committing arson, and Level 4 felony arson. On December 11, 2017, the State filed a notice of intent to use evidence which might implicate Evidence Rule 404(b). The State supplemented this notice on January 2, 2018. A jury trial commenced on January 9, 2018. The State introduced into evidence the three protective orders Smith had obtained against Kincade, Kincade's prior conviction for invasion of privacy for violating one of the protective orders, Kincade's prior threats to harm Smith, and his claim that he could get away with murder. On January 13, 2018, the jury found Kincade guilty as charged. At a sentencing hearing held on February 22, 2018, the trial court vacated the felony murder conviction due to double jeopardy concerns and sentenced Kincade to the maximum term of sixty-five years of incarceration on the murder conviction and a concurrent term of ten years on the arson conviction. Kincade now appeals.

## Failure to Record Bench Conferences

Kincade first contends that the trial court committed reversible error by failing to ensure that the bench conferences held during the trial were recorded. Kincade notes that the court held over forty bench conferences, none of which were recorded. Indiana Criminal Rule 5 provides in relevant part:

> Every trial judge exercising criminal jurisdiction of this state shall arrange and provide for the electronic recording or stenographic reporting with computer-aided transcription capability of any and all oral evidence and testimony given in all cases and hearings, including both questions and answers, all rulings of the judge in

respect to the admission and rejection of evidence and objections thereto, and any other oral matters occurring during the hearing in any proceeding. . . .

[17] Although recording of "any and all oral evidence and testimony" is required, our appellate rules contemplate that failures to record such evidence may still occur. Specifically, Indiana Appellate Rule 31 provides in relevant part:

> **A. Party's Statement of Evidence.** If no Transcript of all or part of the evidence is available, a party or the party's attorney may prepare a verified statement of the evidence from the best available sources, which may include the party's or the attorney's recollection. The party shall then file a motion to certify the statement of evidence with the trial court or Administrative Agency. The statement of evidence shall be submitted with the motion.
>
> **B. Response.** Any party may file a verified response to the proposed statement of evidence within fifteen (15) days after service.
>
> **C. Certification by Trial Court or Administrative Agency.** Except as provided in Section D below, the trial court or Administrative Agency shall, after a hearing, if necessary, certify a statement of the evidence, making any necessary modifications to statements proposed by the parties. The certified statement of the evidence shall become part of the Clerk's Record.

[18] Here, the parties submitted their respective statements of the evidence to the trial court, and the trial court certified a statement of the evidence. Kincade claims that there are still several portions of the bench conferences that are not accounted for. Specifically, he claims that there are "at least thirteen (13)" bench conferences in the transcript relevant to his claims of evidentiary error

that are not accounted for in the trial court's certified statement of the evidence. Appellant's Br. at 13. This, he contends, makes it impossible for us to know the basis for the trial court's evidentiary decisions.

[19] Our supreme court addressed this very issue in *Ben-Yisrayl v. State*, 753 N.E.2d 649 (Ind. 2001). In that case, there were several problems with the transcript, including that most of the bench conferences were not recorded. The court held that "[t]his omission would certainly make it unreasonable to require Ben-Yisrayl to show that any particular allegation of error was preserved by objection and proper argument, and we do not do so." *Id*. at 660. Still, "[i]t [wa]s not unreasonable . . . to require Ben-Yisrayl to articulate some plausible way in which he was harmed by the lack of record of bench conferences." *Id*. at 660–61. In *Ben-Yisrayl*, the court was able to discern the issues that triggered the bench conferences *Id*. at 661. Thus, the court concluded:

> The lack of bench conference records certainly suggests that a reviewing court should take an appropriately liberal approach to issues that might otherwise be considered waived at trial for lack of either objection or argument. It also justifies giving Ben-Yisrayl the benefit of the doubt in speculating about what may have been discussed during any of the unrecorded sidebars.

*Id.*;[4] *see also Kien v. State*, 782 N.E.2d 398, 406–07 (Ind. Ct. App. 2003) (following *Ben-Yisrayl* and holding that appellant's arguments would not be deemed waived for failure to make a contemporaneous objection given the gaps in the transcript), *trans. denied*.

[20] The same is true here. We need not remand for a new trial. Instead we can infer from the transcript that Kincade objected to the admission of the evidence he now claims was improper based on Evidence Rule 404(b), and we give Kincade the benefit of the doubt and find that he has not waived any appellate argument regarding the admission of this evidence. This is sufficient to remedy any gaps in the record. Moreover, although having a record of the trial court's reasons for admitting the evidence would be helpful, we may affirm the trial court's evidentiary ruling if it is sustainable on any basis in the record, even if it was not the reason stated by the trial court. *Robey v. State*, 7 N.E.3d 371, 379 (Ind. Ct. App. 2014), *trans. denied*. We therefore proceed to address Kincade's claims of evidentiary error on their merits.

## Evidence Rule 404(b)

[21] Kincade next argues that the trial court abused its discretion when it admitted evidence of his and Smith's troubled relationship. Questions regarding the admissibility of evidence are entrusted to the sound discretion of the trial court.

---

[4] The court further held that the failure to record the bench conferences "d[id] not, however, relieve Ben-Yisrayl entirely of his obligation to make issue-specific claims of error." *Id.* Here, Kincade adequately makes issue-specific claims of error, which we address *infra*.

*Robey*, 7 N.E.3d at 379. On appeal, we will reverse a trial court's decision on the admissibility of evidence only upon a showing of an abuse of that discretion. *Id*. An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Id*.

[22] Kincade insists that the trial court admitted evidence of his prior actions in contravention of Evidence Rule 404(b). This rule provides:

> **(b) Crimes, Wrongs, or Other Acts.**
>
> > (1) *Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> >
> > (2) *Permitted Uses; Notice in a Criminal Case*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:
> >
> > > (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
> > >
> > > (B) do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice.

Ind. Evidence Rule 404(b).

[23] As we summarized in *Laird v. State*:

> Evidence Rule 404(b) is designed to prevent the jury from making the "forbidden inference" that prior wrongful conduct suggests present guilt. . . . [T]he purpose behind Evidence Rule 404(b) is to prevent[] the State from punishing people for their character, and evidence of extrinsic offenses poses the danger that the jury will convict the defendant because . . . he has a tendency to commit other crimes. In assessing the admissibility of evidence under Evidence Rule 404(b), the trial court must first determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act, and then balance the probative value of the evidence against its prejudicial effect pursuant to Evidence Rule 403. The effect of Rule 404(b) is that evidence is excluded only when it is introduced to prove the forbidden inference of demonstrating the defendant's propensity to commit the charged crime.

103 N.E.3d 1171, 1176–77 (Ind. Ct. App. 2018) (citations and internal quotation marks omitted), *trans. denied*.

[24] Here, we conclude that the evidence of Kincade's prior behavior toward Smith was admissible as evidence of his motive to kill Smith. It is well settled that a defendant's prior violence toward the victim is admissible to establish the defendant's motive. *Iqbal v. State*, 805 N.E.2d 401, 408 (Ind. Ct. App. 2004) (citing *Hicks v. State*, 690 N.E.2d 215, 222 (Ind. 1997)). In fact, "[n]umerous cases have held that where a relationship between parties is characterized by frequent conflict, evidence of the defendant's prior assaults and confrontations with the victim may be admitted to show the relationship between the parties and motive for committing the crime." *Embry v. State*, 923 N.E.2d 1, 9 (Ind. Ct. App. 2010) (quoting *Iqbal*, 805 N.E.2d at 408), *trans. denied*; *see also* 1 Edward J.

Imwinkelried, *Uncharged Misconduct Evidence* § 4:19 (2008) ("When the uncharged acts of domestic violence are directed against the same spouse or partner alleged in the pending charge, there is little or no need to invoke character reasoning in order to justify the admission of the evidence. . . . [T]he trial judge can readily admit the evidence on a noncharacter motive theory; the uncharged acts evidence hostility toward the victim, and in turn that hostility may be the motive for the charged act of domestic violence.") (quoted in *Embry*, 923 N.E.2d at 9).[5]

[25] Accordingly, the trial court did not abuse its discretion by admitting evidence of Kincade's violent relationship with Smith as evidence of Kincade's motive to kill Smith. *See Iqbal*, 805 N.E.2d at 408 (holding that trial court did not abuse its discretion by admitting, in murder trial where defendant was alleged to have killed his wife, evidence of a prior incident during which defendant placed a gun at his wife's head and threatened to kill her leading to the issuance of a protective order and criminal charges against defendant).

---

[5] Kincade notes that our supreme court in *Hicks* noted that evidence of a "bad relationship between the defendant and another person does not bear on the defendant's motive to harm the victim and will rarely be either relevant or admissible to show motive for the charged conduct." 690 N.E.2d at 224 n.12; *see also Iqbal*, 805 N.E.2d at 407 (citing *Hicks*). This, however, refers to a bad relationship between the defendant and a person other than the victim, as the *Hicks* court specifically held that "'[a] defendant's prior bad acts are . . . usually admissible to show the relationship between the defendant and the victim.'" *Id.* at 222 (quoting *Ross v. State*, 676 N.E.2d 339, 346 (Ind. 1996)).

# Conclusion

The trial court's failure to record the bench conferences is concerning, but the remedy for such a failure is to give the defendant the benefit of the doubt regarding the preservation of evidentiary issues on appeal, not a retrial. Considering Kincade's claim on its merits, we conclude that the trial court did not err by admitting evidence of the violent, combative nature of Kincade and Smith's relationship.

Affirmed.

May, J., and Brown, J., concur.