# FOR PUBLICATION



FILED
Apr 24 2014, 9:43 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**STEVEN KNECHT**
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ERIC P. BABBS**
**ANGELA N. SANCHEZ**
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| BRANDON ROBEY, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 12A02-1306-CR-502 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE CLINTON CIRCUIT COURT
The Honorable Thomas Milligan, Senior Judge
Cause No. 12C01-1107-FA-175

**April 24, 2014**

**OPINION – FOR PUBLICATION**

**BRADFORD, Judge**

**CASE SUMMARY**[1]

At some point in the late summer or early autumn of 2010, Appellant-Defendant Brandon Robey caused his six-or-seven-year-old biological daughter, A.P., to fondle his penis and then forced her to fellate him. At some later point, Robey inserted his penis into A.P.'s vagina and anus before ejaculating after rubbing his penis between her thighs. Following a jury trial, Robey was found guilty of four counts of Class A felony child molesting and two counts of Class C felony child molesting. After trial, Robey admitted that he was a habitual offender and a habitual substance offender. Robey contends that the trial court erred in denying his motion to correct error on the basis of alleged juror misconduct, he was denied a fair trial by the admission of what he alleges was impermissible vouching testimony, the prosecutor committed misconduct by improperly vouching for a witness, and his habitual offender admission lacked a sufficient factual basis. We affirm.

**FACTS AND PROCEDURAL HISTORY**

A.P. was born on August 22, 2003, and is the biological daughter of Robey. On one occasion in 2010, after A.P. had started first grade but before Halloween, she was spending the night with Robey at Robey's brother's house. The two were sleeping on the floor when Robey had A.P. touch his "thing" with her hand. Tr. p. 354. After asking A.P. if she wanted to "lick it[,]" Robey placed his hand on the back of her neck and forced her to fellate him. Tr. p. 355.

---

[1] Oral argument was held in this case on April 8, 2014, at Ivy Tech Community College in Lafayette, Indiana. We would like to thank the faculty, staff, and students of Ivy Tech for their hospitality and counsel for the high quality of their arguments.

On a second occasion that was still before Halloween, Robey and A.P. were watching television together in their living room. Robey began to fondle his penis on top of his clothes and then rubbed A.P.'s privates on top of her clothes. A.P. slapped Robey's hand, he stopped, and she fell asleep. A.P. awoke to find Robey's "thing" in her "private." Tr. p. 362. When A.P. protested, Robey said, "It doesn't matter. I'm your father." Tr. p. 367. When A.P. told Robey that it hurt, he said that it would only hurt a minute. At some point Robey also inserted some fingers into A.P.'s vagina. Robey then flipped A.P. over and inserted his penis into her "butt." Tr. p. 369. Roby masturbated himself between A.P.'s legs until "he was shaking … and then white stuff came out." Tr. p. 373.

Eventually, the State charged Robey with four counts of Class A felony child molesting, two counts of Class C felony child molesting, and Class A misdemeanor marijuana possession. The State also alleged that Robey was a habitual offender and a habitual substance offender. Prior to trial, Robey pled guilty to the marijuana charge. Robey's trial began on January 18, 2013. During jury selection, the following exchange occurred involving prospective juror John Brannan:

> THE COURT: Uh, as I mentioned before, the defendant's name is Brandon Robey. Any of you know Brandon Robey or have any connection with him? Yes dir [sic] -- yes sir?
> [Brannan]: Yes, I used to work at the uh, county jail.
> THE COURT: And when was that?
> [Brannan]: (Indiscernible). I think I left there oh, two years ago. Two years ago in March.
> THE COURT: And it was through that connection that you knew Mr. Robey?
> [Brannan]: Yes.

3

THE COURT:  If you were to -- selected and sit as a juror in this case, would your acquaintance with him from the past influence you in considering the -- a verdict?

[Brannan]:  I don't think so.

[Robey's counsel]:  Your Honor –

THE COURT:  -- you think you could set aside whatever you may know and have learned of him in the court?

[Brannan]:  Yes.

[Robey's counsel]:  Your honor, I object.  I think that, that taints the jury venire.  Comments have just been made; what he's just said.  I think it's tainted the venire.  I move uh, strike this venire and get a new jury.

Tr. pp. 172-73.  Robey's motion to strike the jury venire was denied, and Brannan was ultimately seated on the jury.

On January 24, 2013, the jury found Robey guilty of all child molesting counts, and Robey admitted to being a habitual offender and a habitual substance offender.  The two prior felony convictions Robey admitted to committing that supported the habitual offender charge were a 2003 conviction for theft and a 2009 conviction for possession of a controlled substance.

On February 25, 2013, Robey filed a motion to correct error, based on alleged juror misconduct.  Attached to Robey's motion was the following exchange, conducted beginning at 5:04 p.m. on January 24, 2013, via Facebook between juror Julie Gillespie and her friend Hannah Pruitt-Baxter, discussing juror Brannan:

**Julie Gillespie**
One of the jurors was a guard at the jail and overheard him bragging about raping his daughter and getting away with it.  This man told the judge that he was a guard at the jail, and both sides agreed to let him stay on the jury.  So they knew.  And I believe this man was telling the truth.  He was not supposed to reveal that, but thank God he did.  And I am not saying a word.
**Hannah Pruitt-Baxter**
That's crazy!  Well at least God guided u through it!

4

**Julie Gillespie**
I know, right. Because I would have been totally undecided before then.

Appellant's App. p. 216.

On March 22, 2013, the State responded to Robey's motion to correct error, attaching affidavits from Brannan and Gillespie. Brannan's affidavit provided, in part, as follows:

1. Affiant, John Brannan, served as a juror in the case of State v. Brandon Roby in Clinton Circuit Court on January 18, 2013 and January 22-24, 2013.

2. During jury selection, I disclosed my former employment with the Clinton County Sheriff's Office at the county jail. I openly said I was acquainted with the defendant from my work at the jail as a Corrections Officer.

3. My dates of employment at the county jail were February 4, 2008, to March 10, 2011. As per the evidence at trial, the defendant was arrested and incarcerated on these charges on July 6, 2011.
….

6. A third party is claiming Julie Gillespie said that I said I overheard the defendant bragging about raping his daughter and getting away with it.

7. I did not and could not have made such a statement as I did not work at the jail at the time the defendant was arrested and incarcerated for the current charges involving the defendant's daughter.

8. I did not know anything about the current charges or that the defendant had been arrested again until the charges were read to the entire jury panel during jury selection on January 18, 2013.

9. None of us jurors talked about the case at all until deliberations began. At the end of the deliberations, the other jurors did ask me if I had a little bit of insight about the defendant and I acknowledged I had some background information with him.

10. I said I never personally had any problems with him, that he was cordial with me and he really didn't say too much even about why he was incarcerated during the times I was working at the jail during his previous period of incarceration. I remember saying he was always fine with me.

11. I do remember the defendant going to court on another case and coming back to the jail and someone telling me that he was found innocent or only not guilty of a lesser charge. I did tell the other jurors that he had gone to trial on another charge and he either pleaded it out or he was tried and got a lesser charge and it might have had something to [do] with a rape but wasn't

5

even sure about that.

Appellant's App. pp. 230-31.

Gillespie's affidavit provided, in part, at follows:

1.      Affiant, Julie Gillespie, served as a juror in the case of State v. Brandon Robey in Clinton Circuit Court on January 18, 2013 and January 22-24, 2013.

2.      On February 26, 2016, I was contacted by Major Jason Albaugh of the Frankfort Police Department about a Facebook private message between myself and Hannah Pruitt Baxter.

3.      Major Albaugh read me the contents of the private message about what I thought was said by a fellow juror who was a former jail Corrections Officer. I acknowledge the Facebook private message read to me by Major Albaugh was written by me.

4.      Initially, I told Major Albaugh that the fellow juror said he overheard the defendant admitting to another inmate that he had done it to his little girl and he was going to get away with [it]; that I thought that was how the fellow juror worded it.

5.      I was then informed by Major Albaugh that the fellow juror was no longer working at the jail when the defendant was in jail for these current charges.

6.      I am now uncertain that is … what the fellow juror said; that I am unsure the fellow juror said the defendant was talking about his daughter or about someone else.

7.      Further, the fellow juror only mentioned anything at all about the defendant and any past case only after we had come the conclusion that the defendant was guilty of the current case.

Appellant's App. p. 232.

On April 25, 2013, the trial court held a hearing on Robey's motion to correct error, at which only Gillespie appeared as a witness. Gillespie answered in the affirmative when asked if her Facebook message to Pruitt-Baxter regarding what Brannan said to the other jurors was accurate, *i.e.*, that Brannan had heard Robey bragging about raping his daughter. Gillespie also repeatedly testified that Brannan's statement was made only after the jury had

6

reached its unanimous guilty verdict. At the end of the hearing, the trial found that (1) Brannan made the comment Gillespie claimed that he did; (2) Gillespie's Facebook exchange was ambiguous as to the timing of the statement; (3) Gillespie's testimony that Brannan made the statement after the jury reached its verdict was credible; and (4) even if the statement had been made before the jury reached its verdict, it was harmless error at most. The trial court then denied Robey's motion to correct error. On May 13, 2013, the trial court sentenced Robey to eighty years of incarceration to be enhanced by thirty years by virtue of his habitual offender status, for an aggregate term of 110 years.

## DISCUSSION

### I. Whether the Trial Court Abused its Discretion in Denying Robey's Motion to Correct Error

Robey contends that the trial court abused its discretion in denying his motion to correct error, which was based on alleged juror misconduct. When ruling on a motion to correct error, the trial court sits as the initial fact-finder concerning the issues raised, and we review its decision for an abuse of discretion. *Booher v. State*, 773 N.E.2d 814, 817 (Ind. 2002). Robey alleges that juror Brannan brought extraneous prejudicial information to the jury's attention, necessitating a retrial. A defendant seeking a new trial because of juror misconduct must show that the misconduct (1) was gross and (2) probably harmed the defendant. *Lopez v. State*, 527 N.E.2d 1119, 1130 (Ind. 1988). "We review the trial judge's determination on these points only for abuse of discretion, with the burden on the appellant to show that the misconduct meets the prerequisites for a new trial." *Griffin v. State*, 754 N.E.2d 899, 901 (Ind. 2001), *on reh'g*, 763 N.E.2d 450 (Ind. 2002). At all times relevant to

7

this appeal, Indiana Rule of Evidence 606(b) provided as follows:

> *Inquiry into Validity of Verdict or Indictment.* Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify (1) to drug or alcohol use by any juror, (2) on the question of whether extraneous prejudicial information was improperly brought to the jury's attention or (3) whether any outside influence was improperly brought to bear upon any juror. A juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying may not be received for these purposes.[2]

Robey argues that the trial court erred in concluding that Gillespie's Facebook exchange was ambiguous regarding the timing of Brannan's statement. Arguably, Gillespie's assertion that she "would have been totally undecided" before hearing Brannan's statement could be interpreted as indicating she had not made up her mind yet. Gillespie, however, also testified unequivocally several times at the hearing that Brannan's statement occurred *after* the jury had reached its final verdict, which, if believed, Robey acknowledges would fatally undercut his argument. *See, e.g.*, *Krivanek v. State*, 252 Ind. 277, 291, 247 N.E.2d 505, 513-

---

[2] Effective January 1, 2014, Evidence Rule 606(b) now provides as follows:

(b) During an Inquiry into the Validity of a Verdict or Indictment.
　　(1) Prohibited Testimony or Other Evidence. During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.
　　(2) Exceptions. A juror may testify about whether:
　　　　(A) any juror's drug or alcohol use;
　　　　(B) extraneous prejudicial information was improperly brought to the jury's attention;
　　　　(C) an outside influence was improperly brought to bear on any juror; or
　　　　(D) a mistake was made in entering the verdict on the verdict form.

14 (1969) ("In order for the extraneous evidence interjected by juror Towner to have prejudiced the jury, it must appear that the evidence was interjected into the deliberations prior to the time the entire jury reached a verdict. It is obvious that if the information was divulged after the jury had reached its verdict, and not while the jury was deliberating, it could not have effected [sic] the verdict since the jury would not have known of the information prior to arriving at its verdict.").

Following the hearing on Robey's motion to correct error, the trial court made the following finding: "The Court believes that [Gillespie's] testimony today uh, confirms the fact that it was uh, revealed after the jury had voted uh, on a -- oh a verdict. Uhm, the Court therefore finds that the uh, that uh, there was no misconduct at all because after the verdict is reached uh, the jurors are free to talk about other things." Tr. p. 767. The trial court was entitled to believe Gillespie's testimony and did. Robey's argument in this regard is essentially an invitation to reweigh the evidence, which we will not do. *See Palilonis v. State*, 970 N.E.2d 713, 724 (Ind. Ct. App. 2012), *trans. denied* ("We therefore find Palilonis's argument to be a request to reweigh the evidence on this issue, which we may not do.").

## II. Whether Robey Was Denied a Fair Trial by the Admission of Allegedly Vouching Testimony

Robey challenges the admission of several statements by A.P.'s child services interviewer and her psychologist. The admissibility of evidence is within the sound discretion of the trial court. *Curley v. State*, 777 N.E.2d 58, 60 (Ind. Ct. App. 2002). We will only reverse a trial court's decision on the admissibility of evidence upon a showing of

9

an abuse of that discretion. *Id.* An abuse of discretion may occur if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Id.* The Court of Appeals may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even though it was not the reason enunciated by the trial court. *Moore v. State*, 839 N.E.2d 178, 182 (Ind. Ct. App. 2005). We do not reweigh the evidence and consider the evidence most favorable to the trial court's ruling. *Hirsey v. State*, 852 N.E.2d 1008, 1012 (Ind. Ct. App. 2006).

Robey acknowledges that he objected to none of the testimony he now challenges. As such, Robey has waived the claim for appellate consideration. The purpose of the contemporaneous objection rule is to promote a fair trial by preventing a party from sitting idly by and appearing to assent to an offer of evidence or ruling by the court only to cry foul when the outcome goes against him. *Purifoy v. State*, 821 N.E.2d 409, 412 (Ind. Ct. App. 2005), *trans. denied* (citation omitted). Robey, however, attempts to avoid the effect of his waiver by contending that the statements' admission constituted fundamental error. Fundamental error is "error so egregious that reversal of a criminal conviction is required even if no objection to the error is registered at trial." *Hopkins v. State*, 782 N.E.2d 988, 991 (Ind. 2003). The standard for fundamental error is whether the error was so prejudicial to the rights of the defendant that a fair trial was impossible. *Krumm v. State*, 793 N.E.2d 1170, 1181-82 (Ind. Ct. App. 2003). Fundamental error requires prejudice to the defendant. *Hopkins*, 782 N.E.2d at 991.

Evidence Rule 704(b) provides that "[w]itnesses may not testify to opinions

concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." In *Hoglund v. State*, 962 N.E.2d 1230 (Ind. 2012), the Indiana Supreme Court made clear that this concept applies with equal force to testimony that is the functional equivalent of vouching testimony. *See id*. at 1237 ("[W]e expressly overrule that portion of *Lawrence* allowing for 'some accrediting of the child witness in the form of opinions from parents, teachers, and others having adequate experience with the child, that the child is not prone to exaggerate or fantasize about sexual matters.' 464 N.E.2d at 925.").

## A. DCS Case Manager Landra Talbott

Talbott interviewed A.P. regarding her allegations that Robey had molested her. Robey challenges Talbott's testimony that A.P.'s demeanor was "matter of fact" and Talbott's explanation that such responses did not surprise her "because it's a very normalized behavior for that child. And uhm, they don't see – they're beyond the fact that it has been a trauma to them and it's just a way of life." Tr. pp. 330, 331. The State argues, and we agree, that this court's opinion in *Kindred v. State*, 973 N.E.2d 1245 (Ind. Ct. App. 2012), *trans. denied*, should control. In *Kindred*, we held that an expert may provide general testimony about the signs of coaching in a child victim and can also testify about whether any of the signs were observed in the particular alleged victim. *Id*. at 1257. Talbott's comments were general in nature, and she did not directly comment on whether A.P.'s accusations against Robey were true in particular or whether A.P. was a truthful person in general. As in *Kindred*, we conclude that Talbott permissibly provided general testimony regarding children

11

with matter-of-fact demeanors and that A.P. exhibited such a demeanor. Robey has failed to establish fundamental error in this regard.

Moreover, as the State points out, the State elicited the challenged testimony in response to Robey's argument that A.P. must be lying because of her demeanor. Specifically, Robey's trial counsel asked the jury to take note of A.P.'s demeanor during her interview with Talbott (a video recording of which was shown to the jury), saying, "The child is not traumatized like you'd expect." Tr. p. 318. Even if the testimony in question were impermissible vouching, the State was doing nothing more than rebutting a possibly misleading suggestion that A.P.'s demeanor during the interview indicated that she must be lying. "A prosecutor is entitled to respond to allegations and inferences raised by the defense even if the prosecutor's response would be otherwise objectionable." *Lopez*, 527 N.E.2d at 1126.

### B. Counselor Susan Moody

Robey also challenges three statements by A.P.'s counselor Moody: that (1) she never thought that A.P. was lying to her, (2) she proceeded with treatment of A.P. assuming that A.P. was molested based on what A.P. told her, and (3) A.P. was being treated for post-traumatic stress disorder ("PTSD") caused by "[t]he trauma of the things that she details that the defendant did to her." Tr. p. 432. The State argues that the first two statements were elicited by Robey and should therefore constitute invited error. "'The doctrine of invited error is grounded in estoppel.'" *Wright v. State*, 828 N.E.2d 904, 907 (Ind. 2005) (quoting *Witte v. Mundy*, 820 N.E.2d 128, 133 (Ind. 2005)). "Under this doctrine, 'a party may not

12

take advantage of an error that she commits, invites, or which is the natural consequence of her own neglect or misconduct.'" *Id.* (quoting *Witte*, 820 N.E.2d at 133-34).

We agree with the State that the first two statements by Moody were elicited by Robey and, therefore, constitute invited error. During cross-examination of Moody, Robey questioned her extensively, repeatedly challenging Moody's testimony that some of A.P.'s behaviors were the result of PTSD and questioning whether they might be attributable instead to the stress of fabricating the allegations against Robey. Moody testified how A.P. would regress when required to give a deposition in the case, regression that Moody attributed to A.P. knowing that she would have to recount the molestation. The following exchange occurred at this point:

> [Defense counsel:] And so how can you be sure that her behavior, as far as holding the animal and sucking her thumb, wasn't just behavior in response to having to go take a deposition regarding a made up story? Wouldn't that stress her out as well?
> [Moody:] It appeared to me that the behavior was tied to what she was going to have to discuss.
> [Defense counsel:] That's true. That's the same question I'm asking. I think it was what she had to discuss too, but I'm asking you how can you be sure that it wasn't facing her accuser? I mean the accused. But, rather the fact that she would have to retell a story that wasn't true. How can you be so sure?
> [Moody:] I have never thought that this child was telling me things that were not true.

Tr. p. 424. Moody's first statement, that she never thought that A.P. lied to her, even if objectionable, was invited by Robey.

As for Moody's second statement, it again occurred during cross-examination, when Robey was questioning how she could know what was causing A.P.'s mood swings and anger. The following exchange took place:

13

[Moody:] We've talked many times about her feelings; her emotions. That's uh, an expected part of therapy to actually explore the reason for the anger. Uhm, I've not so as [sic] concerned about the reason for the anger as helping the client deal with and manage their emotions. It was very apparent to me what brought this child to therapy.

[Defense counsel:] But, isn't that because that's what you were told? I mean I i -- isn't it true that she was guilty before proven? You've taken as fact that this child has been molested, haven't you?

[Moody:] Based on what the child disclosed to me, yes sir, I have.

Tr. pp. 428-29. This testimony, that Moody proceeded with treatment based on A.P.'s disclosures, was elicited by Robey and, as such, could only constitute invited error.

Finally, as for Moody's third statement, it occurred during a brief redirect, during which the prosecutor asked what caused A.P.'s PTSD, to which Moody responded, "[t]he trauma of the things that she details that the defendant did to her." Tr. p. 432. We conclude that this statement does, in fact, constitute impermissible vouching. For Moody to be treating A.P. based on what A.P. told her that Robey did to her, the unescapable implication is that Moody believed what A.P. told her. Moody's statement, however, was, at most, merely cumulative of her previous statements discussed above, both of which were elicited by Robey. "[A]n error in the admission of evidence is harmless if the erroneously admitted evidence is cumulative of other evidence appropriately admitted." *Collins v. State*, 826 N.E.2d 671, 679 (Ind. Ct. App. 2005), *trans. denied*. Moody had already testified that she never though A.P. told her things that were not true and that she believed that A.P. had been molested based on what A.P. had told her, testimony that was not erroneously admitted. The admission, therefore, of Moody's third challenged statement was, at most, harmless error. Robey has failed to establish fundamental error caused by the admission of vouching

14

testimony.

### III. Prosecutor's Statement During Closing

Robey also alleges that the prosecutor made improper statements during closing that amounted to vouching for the testimony of Dr. Roberta Hibbard, who examined A.P. on July 14, 2011. (Tr. 600). "[I]t is improper for the State to comment on the credibility of a witness unless 'the assertions are based on reasons which arise from the evidence.'" *Gaby v. State*, 949 N.E.2d 870, 881 (Ind. Ct. App. 2011). Dr. Hibbard testified that her examination of A.P. did not uncover any physical evidence in either the genitals or anus that would indicate molestation, but that this lack of evidence did not exclude abuse and that the vast majority of children, even if penetrated, will have normal examinations. During closing, the prosecutor contrasted Dr. Hibbard's testimony with statements made by Robey during an interview with Major Albaugh, including, "Somebody my size put a penis in a girl that size vagina, you'd be able to find something out." Tr. p. 682. The prosecutor stated, "I trust her line of work rather than his reasoning." Tr. p. 683. First, this statement is not commenting on Dr. Hibbard's credibility but, rather, her expertise as a medical doctor. Moreover, Robey mentioned the lack of physical evidence of molestation in his opening: "In that exam two weeks after this supposedly occurred, the doctor determined her hymen was intact and the labia was free of lesions." Tr. p. 319. As previously mentioned, "[a] prosecutor is entitled to respond to allegations and inferences raised by the defense even if the prosecutor's response would be otherwise objectionable." *Lopez*, 527 N.E.2d at 1126. Under the circumstances, we conclude that the prosecutor was justified in mentioning Dr. Hibbard's testimony, even if

it could be interpreted as otherwise impermissible vouching.

Finally, the statement was based on reasons that arose from the evidence, as the State presented ample evidence of Dr. Hibbard's expertise in the area, including that she earned her M.D. in 1980 and is board-certified in general and child abuse pediatrics, she directs the child protection programs at Riley Hospital for Children, and her team of three board-certified child abuse pediatricians consulted on three thousand cases of suspected maltreatment and personally evaluated approximately 750 children in one year alone. The prosecutor was merely asking the jury to place more stock in the statements of Dr. Hibbard due to her expertise, which the record amply supports, rather than her credibility. Robey has failed to establish error in this regard.

### IV.  Whether Robey May Challenge his Habitual Offender Adjudication on Direct Appeal

Finally, Robey contends, and the State does not dispute, that one of the predicate felonies used to establish his habitual offender status, which he admitted below, does not qualify, rendering the factual basis inadequate. Indiana Code section 35-50-2-8 provides, in part that

> Except as otherwise provided in this section, the state may seek to have a person sentenced as a habitual offender for any felony by alleging, on a page separate from the rest of the charging instrument, that the person has accumulated two (2) prior unrelated felony convictions.
> ….
> (d) A conviction does not count for purposes of this section as a prior unrelated felony conviction if:
> (1) the conviction has been set aside;
> (2) the conviction is one for which the person has been pardoned; or
> (3) all of the following apply:
> (A) The offense is an offense under IC 16-42-19 or IC 35-48-4.

16

(B) The offense is not listed in section 2(b)(4) of this chapter.
(C) The total number of unrelated convictions that the person has for:
(i) dealing in or selling a legend drug under IC 16-42-19-27;
(ii) dealing in cocaine or a narcotic drug (IC 35-48-4-1);
(iii) dealing in a schedule I, II, III controlled substance (IC 35-48-4-2);
(iv) dealing in a schedule IV controlled substance (IC 35-48-4-3); and
(v) dealing in a schedule V controlled substance (IC 35-48-4-4);
does not exceed one (1).

There is no dispute that Robey's prior conviction for possession of a controlled substance, although a felony, cannot be used to support a habitual offender adjudication pursuant to subsection 35-50-2-8(d)(3). In other words, Robey's admission to habitual offender status lacks a sufficient factual basis.

In Indiana, however, it is well-settled that a person who pleads guilty cannot challenge his convictions by means of direct appeal, *see Kling v. State*, 837 N.E.2d 502, 504 (Ind. 2005), and the same is true of one who admits to habitual offender status. *See Stanley v. State*, 849 N.E.2d 626, 630 (Ind. Ct. App. 2006). One of the things a person gives up by pleading guilty is the right to a direct appeal. *Tumulty v. State*, 666 N.E.2d 394, 395-96 (Ind. 1996). In *Tumulty*, the defendant pled guilty to several crimes and admitted to being a habitual offender. *Id.* at 395. On direct appeal, Tumulty, as does Robey, challenged his habitual offender adjudication on the basis that it lacked a sufficient factual basis. *Id.* The Indiana Supreme Court rejected Tumulty's argument on the basis that he was foreclosed from challenging his habitual offender adjudication on direct appeal following an admission. *Id.* at 396. The *Tumulty* court laid out the justification for the rule:

The long-standing judicial precedent limiting the avenue of direct appeal for guilty plea challenges stands on multiple grounds. First, the plea as a legal act brings to a close the dispute between the parties, much as settling civil parties do by submitting an agreed judgment. To permit appeal by settling parties would, of course, make settlements difficult to achieve in any litigation.

There is a practical reason for the limit on appeals. Of the 31,973 criminal cases adjudicated by Indiana trial courts in 1994 (the most recent figures available), some 28,867, or ninety percent were disposed of by guilty plea. Allowing the new remedy of direct appeal for those 28,867 guilty pleas has the potential to multiply dramatically the caseload in the appellate courts by offering appeals to thousands of admitted felons. In the same year the state's appellate courts heard 1,116 direct criminal appeals.

*Id*. at 396 (footnotes omitted). The court noted that the proper vehicle for challenging a habitual offender adjudication after admitting to it is a petition for post-conviction relief ("PCR") filed pursuant to Indiana Post-Conviction Rule 1. *Id*.

Robey understandably argues that it would be more efficient to address his claim in this direct appeal, as the record currently before us on direct appeal is sufficient to resolve it, rather than force him to file a PCR petition to get the relief that all agree he is due. This court accepted that very argument in *Tumulty*, a case which cannot be meaningfully distinguished from this one. *See Tumulty v. State*, 647 N.E.2d 361, 364 (Ind. Ct. App. 1995), *vacated*, 666 N.E.2d 394 (Ind. 1996). The Indiana Supreme Court, however, vacated that opinion and rejected that argument. *Id*. at 395 (noting that "the Court of Appeals held in this case that a defendant should be permitted to appeal from a plea of guilty whenever the record of the guilty plea is adequate to resolve the issue being appealed"). While it may seem odd to apply precedent grounded on the idea of judicial efficiency in a way that arguably produces

18

*in*efficiency,[3] we are absolutely bound by *Tumulty* on this point:

> We are bound by the decisions of our supreme court. *See In re Petition to Transfer Appeals*, 202 Ind. 365, 376, 174 N.E. 812, 817 (1931). Supreme court precedent is binding upon us until it is changed either by that court or by legislative enactment. *Id.* While Indiana Appellate Rule 65(A) authorizes this Court to criticize existing law, it is not this court's role to "reconsider" supreme court decisions.

*Dragon v. State*, 774 N.E.2d 103, 107 (Ind. Ct. App. 2002), *trans. granted*, (Ind. 2002), *trans. vacated*, (Ind. 2003). There is, quite simply, no room in *Tumulty*'s holding for any exceptions to the rule that you cannot challenge a habitual offender adjudication on direct appeal after pleading guilty. If Robey wishes to further challenge the factual basis underlying his admission to being a habitual offender, he will have to do so in a PCR

---

[3] We would be remiss if we failed to note that some potential inefficiency and delay might have been avoided had Robey used the *Davis/Hatton* procedure and filed a PCR petition prior to the resolution of his direct appeal. We described the procedure in *Slusher v. State*, 823 N.E.2d 1219, 1222 (Ind. Ct. App. 2005):

> [W]here it is necessary on appeal to develop an additional evidentiary record to evaluate the reasons for trial counsel's [alleged] error, the proper procedure is to request that the appeal be suspended or terminated so that a more thorough record may be compiled through the pursuit of postconviction proceedings. This procedure for developing a record for appeal is more commonly known as the *Davis/Hatton* procedure. *See Hatton v. State*, 626 N.E.2d 442, 443 (Ind. 1993); *Davis v. State*, 267 Ind. 152, 368 N.E.2d 1149, 1151 (1977). As we explained, the *Davis/Hatton* procedure involves a termination or suspension of a direct appeal already initiated, upon appellate counsel's motion for remand or stay, to allow a postconviction relief petition to be pursued in the trial court. If the appellate court preliminarily determines that the motion has sufficient merit, the entire case is remanded for consideration of the petition for post-conviction relief. If, after a full evidentiary hearing the post-conviction relief petition is denied, the appeal can be reinitiated. Thus, in addition to the issues initially raised in the direct appeal, the issues litigated in the postconviction relief proceeding can also be raised. This way, a full hearing and record on the issue will be included in the appeal. If the petition for post-conviction relief is denied after a hearing, and the direct appeal is reinstated, the direct appeal and the appeal of the denial of post-conviction relief are consolidated.

Robey's claim would not have required any supplementation to the record and therefore would likely have been resolved expeditiously. The State's argument that the import of a PCR, which would give them an opportunity to gather additional evidence of prior convictions as to why a PCR hearing should be required, is unpersuasive. *Tumulty*, though, clearly requires this procedure.

petition.  *See Stanley*, 849 N.E.2d at 630.

## CONCLUSION

We conclude that the trial court did not abuse its discretion in denying Robey's motion to correct error on the basis of alleged juror misconduct.  We further conclude that Robey failed to establish fundamental error in the admission of alleged vouching testimony or alleged improper remarks by the prosecutor during closing.  Finally, Robey cannot challenge the factual basis for his habitual offender adjudication on direct appeal because he admitted to being a habitual offender below.

We affirm the judgment of the trial court.

RILEY, J., and ROBB, J., concur.

20