## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Bruce W. Graham
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Samuel Jude Clark,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 27, 2019

Court of Appeals Case No.
19A-CR-172

Appeal from the
Tippecanoe Superior Court

The Honorable
Kristen E. McVey, Judge

Trial Court Cause No.
79D05-1706-F6-589

**Altice, Judge.**

# Case Summary

A jury found Samuel Jude Clark guilty of theft, conspiracy to commit obstruction of justice, and obstruction of justice, all Level 6 felonies. Clark admitted to being a habitual offender. He appeals and raises three issues that we restate as:

> I. Can Clark, who admitted to being a habitual offender, challenge the habitual offender adjudication on direct appeal by claiming that his trial counsel was ineffective?

> II. Do Clark's convictions for conspiracy to commit obstruction of justice and obstruction of justice violate double jeopardy principles?

> III. In sentencing Clark, did the trial court fail to specify which felony was being enhanced for the habitual offender adjudication?

We affirm and remand for sentence clarification.

# Facts & Procedural History

On November 21, 2016, Tony Goin was the acting manager of CD Land, an electronics retail store in Lafayette that bought and sold CDs and DVDs. Perry Baldridge, who was Clark's roommate, entered the store around 11:30 a.m. Also in the store at that time was a customer known to Goin as Jamal. Goin recognized both Baldridge and Jamal and considered them to be frequent customers. Clark entered the store a few minutes after Baldridge and stood near the front door. After Baldridge and Goin finished their business, Clark left

the store and Baldridge walked out right behind him. Goin then heard the sound of breaking glass and a vehicle alarm. Jamal alerted Goin that the vehicle alarm was Goin's black Jeep. Goin called 911 as he rushed outside, and as he reached the parking lot, Goin saw a black Chrysler sedan drive away. Jamal told Goin that he had seen Clark and Baldridge, who Jamal knew, get into the Chrysler. In Goin's 911 call, he told police that the suspected perpetrators were Clark and Baldridge.

[4] When Goin reached his Jeep, he saw that the front driver's side window had been smashed and that his briefcase was missing from the front passenger seat. Inside the briefcase were the following: (1) $10,000 in cash and vehicle titles, as Goin planned to buy a vehicle that day, (2) Goin's wallet containing another $1100, his credit cards, and his driver's license, and (3) prescription medicines. Lafayette Police Department Officer Steven Prothero arrived about six or seven minutes after Goin made the 911 call and, based on Goin's statements and "distinctive description" of the suspects, Officer Prothero was able to identify Baldridge "due to recent contact" with him. *Id.* at 95.

[5] Meanwhile, Baldridge and Clark drove to their residence, and, once inside, Baldridge saw Goin's briefcase and its contents including the cash, car titles, credit cards, and Goin's identification. Clark gave some of the cash to Baldridge. As police cars began arriving, Clark grabbed "everything" and ran out the back door. *Id.* at 72. Baldridge hid under a floorboard in the attic before being discovered by police.

[6]     On June 6, 2017, the State charged Clark with Level 6 felony theft and alleged he was a habitual offender. In March 2018, the State added Count II, Level 6 felony conspiracy to commit obstruction of justice, Count III, Level 6 felony obstruction of justice, and Count IV, Level 6 felony conspiracy to commit intimidation. The State dismissed the conspiracy to commit intimidation charge on December 19, 2018.

[7]     At the December 2018 jury trial, Goin testified to the above circumstances surrounding the theft from his Jeep. Baldridge, who was under subpoena, appeared and testified pursuant to a term in his plea agreement for Level 6 felony theft that required him to "testify truthfully in any hearing, trial, or court proceeding involving the events in this case." *State's Exhibit 12.* Baldridge testified that on November 21, 2016, he and Clark went to CD Land, with Baldridge driving his sister's black Chrysler sedan. Baldridge said that after he was done with his transaction with Goin, he walked to his car. As he was plugging in his phone and putting on his seatbelt, he heard a window shatter. Clark then jumped into the back of the car and yelled, "go, go, go." *Transcript Vol. 2* at 70, 78. Baldridge said that when Clark got in the car, he was carrying a laptop-type of briefcase. Baldridge stated that, after they were back at their residence and he saw all of Goin's credit cards and vehicle titles, he "put two and two together" and "figured [] out" that Clark had taken the briefcase from Goin's Jeep. *Id*. at 71. Baldridge said that he did not know beforehand that Clark was going to break into Goin's vehicle and steal from him, stating, "If I could have prevented it I would've." *Id*. at 83.

[8]    Baldridge testified that, while in jail in January 2018, he met fellow inmate Michael Tunis, who knew Clark. According to Baldridge, Tunis told him that, since he (Baldridge) had already pled guilty, he needed to sign a note saying that "Jude Clark was innocent" and "did not commit the crime" because "it would be stupid for two people to go down" and, instead, Baldridge needed to "take the fall for it." *Id*. at 74. Baldridge said that Tunis wrote the note and handed it to Baldridge for his signature. It read:

> Samual Jude Clark had nothing to do with the theft that occured at CD Land on November of 2016. I am the one who committed this crime on my own occord.

*State's Exhibit 5* (spelling in original). Baldridge testified that the contents of the note were not accurate, but he signed it because he was scared. Tunis told Baldridge he had to contact the jail's notary public and get it notarized and that, if he did not do so, Tunis and others "were going to jump" him. *Transcript Vol. 2* at 74. Baldridge got his signature notarized and gave the note back to Tunis.[1]

[9]    Prior to trial and as part of discovery in Clark's case, the false statement was submitted to the Tippecanoe County Prosecutor's Office. After receiving information that the letter was not actually authored by Baldridge, Investigator Brad Hayworth began an investigation into the matter. Hayworth testified that he met with Baldridge and his attorney, and he listened to recorded jail phone

---

[1] We note that Tunis also appeared at trial under subpoena but refused to testify and was held in contempt.

calls that Tunis made to Clark in January and February 2018, in which the two discussed getting Baldridge to sign a statement saying that Clark did not commit the theft. After listening to the calls, Hayworth met with Tunis, who confirmed that it was him speaking to Clark in the calls, which related to a plan to have Baldridge sign a false statement. The phone calls were played for the jury.

[10] The jury found Clark guilty of Counts I, theft, Count II, conspiracy to commit obstruction of justice, and Count III, obstruction of justice. Clark waived his right to a trial by jury on the habitual offender enhancement and admitted to being a habitual offender. Following a sentencing hearing, the trial court sentenced Clark to one and one-half years for each conviction, enhanced by four years on the habitual offender adjudication, ordering the sentences in Counts II and III to be served concurrently but consecutive to the sentence imposed in Count I, for a seven-year aggregate sentence. The trial court ordered six years executed and one year served at a level to be determined by community corrections. Clark now appeals.

## Discussion & Decision

## I. Habitual Offender Adjudication

[11] Clark asserts that we should reverse his habitual offender adjudication because he received ineffective assistance of trial counsel, arguing that his trial counsel was ineffective by allowing Clark to admit to the habitual offender status when the charging information allegedly did not list three prior unrelated felonies as

required by statute. Clark's habitual offender charging information alleged the following four prior convictions:

> On or about **September 27, 2006**, Samuel Jude Clark was convicted and sentenced of the crime of Resisting Law Enforcement (Class D felony) and Receiving Stolen Property (Class D felony), in Cause No. 4lD03-0410-FB-24 **committed on or about October 19, 2004**.

> On or about **September 27, 2006**, Samuel Jude Clark was convicted and sentenced of the crime of Auto Theft (Class D felony), in Cause No. 4lD03-0410-FD-272 **committed on or about October 19, 2004**.

> On or about **February 27, 2007,** Samuel Jude Clark was convicted and sentenced of the crime of Possession of Stolen Property (Class D felony), in Cause No. 79D06-0608-FD-l90 **committed on or about August 29, 2006**.

> On or about **February 29, 2012**, Samuel Jude Clark was convicted and sentenced of the crime of Possession of Methamphetamine (Class C felony), Theft (Class D felony) and Theft (Class D felony), in Cause No. 79D02-1108-FB-35 **committed on or about August 26, 2011**.

*Appellant's Appendix Vol. II* at 14 (emphasis added). The crux of Clark's appellate claim is that the habitual offender information was "defective on its face" because, due to overlapping dates of offenses, it did not demonstrate that Clark had three prior unrelated felonies as required by Ind. Code § 30-50-2-8 and that, as a result, there was "insufficient evidence to demonstrate that he was a habitual offender." *Appellant's Brief* at 12, 14.

[12]     As Clark acknowledges, our Supreme Court in *Tumulty v. State*, 666 N.E.2d 394, 395-96 (Ind. 1996), held that where a defendant admitted to being a habitual offender, he or she may not challenge a habitual offender enhancement on direct appeal and that, instead, the appropriate avenue to challenge a habitual offender adjudication after admitting to it was to petition for post-conviction relief. This court reaffirmed that principle in *Robey v. State*, 7 N.E.3d 371 (Ind. Ct. App. 2014), *trans. denied*.

[13]     In *Robey*, a defendant appealed his habitual offender adjudication contending that it lacked a sufficient factual basis. Specifically, Robey asserted that one of the predicate felonies used to establish his habitual offender status, which he had admitted to, did not qualify under I.C. § 35-50-2-8. The State did not dispute Robey's claim. Even so, the *Robey* court affirmed the trial court's adjudication, explaining:

> In Indiana, [] it is well-settled that a person who pleads guilty cannot challenge his convictions by means of direct appeal, *see Kling v. State*, 837 N.E.2d 502, 504 (Ind. 2005), and the same is true of one who admits to habitual offender status. *See Stanley v. State*, 849 N.E.2d 626, 630 (Ind. Ct. App. 2006).
>
> * * * *
>
> There is, quite simply, no room in *Tumulty*'s holding for any exceptions to the rule that you cannot challenge a habitual offender adjudication on direct appeal after pleading guilty. If Robey wishes to further challenge the factual basis underlying his admission to being a habitual offender, he will have to do so in a PCR petition.

7 N.E.3d at 383-84.

[14] Clark presents his claim as one for ineffective assistance of counsel, asserting that his trial counsel was ineffective by both failing to object to a deficient habitual offender charging information and "having Clark admit he was a Habitual Offender," when it was "evident on the face of the document" that Clark did not qualify as such. *Reply Brief* at 6. Clark's ineffectiveness claim effectively asks us to decide whether the habitual offender charging information was deficient for failing to identify three unrelated prior convictions. However, Indiana courts have made clear that where a defendant admitted to being a habitual offender as charged, he may challenge the resulting adjudication, including the sufficiency of the charging information, only by filing a petition for post-conviction relief. *See Robey*, 7 N.E.3d at 383.

[15] We thus decline Clark's request to bootstrap his habitual offender challenge into a direct appeal by labeling it an ineffective assistance of counsel claim. *See, e.g., Stanley v. State*, 849 N.E.2d 626, 629 (Ind. Ct. App. 2006) (although defendant framed issue on direct appeal as a sentencing error – arguing that his thirty-year sentence was erroneous because one of the predicate offenses supporting his habitual offender enhancement did not count as a prior unrelated felony conviction – appellate court found that the crux of defendant's argument was that the factual basis supporting his admission as habitual offender was insufficient, and therefore defendant's claim needed to be brought by a petition for post-conviction relief). Accordingly, we affirm the trial court's habitual offender adjudication. *Robey*, 7 N.E.3d at 384 (affirming habitual offender

adjudication, even though there was no dispute that one of the predicate felonies used to establish his habitual status did not qualify, because defendant needed to seek relief through post-conviction remedies).

## II. Double Jeopardy

Clark asserts that his convictions for Count II, conspiracy to commit obstruction of justice, and Count III, obstruction of justice, violate the Double Jeopardy Clause of the Indiana Constitution, which provides: "No person shall be put in jeopardy twice for the same offense." Ind. Const. art. 1, § 14. "Indiana's Double Jeopardy Clause ... prevent[s] the State from being able to proceed against a person twice for the same criminal transgression." *Lumbley v. State*, 74 N.E.3d 234, 241 (Ind. Ct. App.), *trans. denied*. The Indiana Supreme Court has held that "two or more offenses are the 'same offense' in violation of Article 1, Section 14 of the Indiana Constitution, if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999).

Clark does not assert a violation under the statutory elements test. Instead, he claims that his convictions constitute double jeopardy under the actual evidence test. "The actual evidence test prohibits multiple convictions if there is 'a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to

establish the essential elements of a second challenged offense.'" *Gibson v. State,* 111 N.E.3d 247, 254-55 (Ind. Ct. App. 2018) (quoting *Richardson*, 717 N.E.2d at 53), *trans. denied*. A "reasonable possibility" requires "substantially more than a logical possibility." *Lee v. State*, 892 N.E.2d 1231, 1236 (Ind. 2008). "'[R]easonable possibility' turns on a practical assessment of whether the jury may have latched on to exactly the same facts for both convictions." *Id*. Here, Clark contends that the evidence used to support the conspiracy charge "was the same evidence used to demonstrate the actual Obstruction of Justice" charge, more specifically, that the overt act in furtherance of their agreement was Clark's submission of the letter to the prosecutor's office, which was the same act that supported the obstruction charge. *Appellant's Brief* at 18.

[18]    In determining the facts used by the jury to establish the elements of each offense, we consider the charging information, jury instructions, and arguments of counsel. *Gibson*, 111 N.E.3d at 255. In this case, the charging information for the conspiracy count alleged an agreement between Clark and Tunis and a number of overt acts in furtherance of their agreement:

> Clark and/or Tunis made phone calls to each other; while speaking on the phone, Clark and Tunis agreed to make Perry Baldridge sign a letter stating that Clark was innocent of the charges filed against him; Clark instructed Tunis to have said letter notarized to make it a legal document; Tunis made Baldridge sign said letter; Tunis made Baldridge order a notary to notarize said letter; Tunis and/or Baldridge mailed said letter to Clark's mother's house; Clark submitted said letter as discovery in a pending criminal proceeding filed against Clark.

*Appellant's Appendix Vol. II* at 52. While we recognize that the charging information for conspiracy identifies submission of the false letter in the criminal proceeding as an overt act, it was one of several overt acts listed in the charging information. Our Supreme Court faced a similar situation in *Redman v. State* 743 N.E.2d 263, 267 (Ind. 2001). There, the defendant challenged his convictions for criminal confinement and conspiracy to commit murder on double jeopardy grounds, arguing that the jury used evidence of the victim's abduction to establish both the overt act of the conspiracy as well as criminal confinement. In *Redman*, as in the present case, the charging information identified four alternative overt acts, one of which was abduction, and Redman argued that there was a reasonable possibility that the evidentiary facts used by the jury to establish abduction in the conspiracy charge may also have been used to establish the essential element of forceful removal in the criminal confinement charge.

[19] Our Supreme Court rejected Redman's claim, observing that the State, in closing argument, argued that Reman and his accomplices "performed one or more of the overt acts, either the abduction, the confinement, the rape or the disposal of the body" and, while the State urged that all of them occurred, the prosecutor reminded the jury "if you only believe one of them occur[red] and not the others that's sufficient to convict." *Id.* at 268. The Redman Court also reviewed the jury instructions, which instructed that to convict Redman of conspiracy as charged the State must have proven, among other things, that Redman and one or more others performed an overt act in furtherance "by

either abducting, or confining, or raping, or disposing of the body." *Id.* The Court concluded that "in view of the extensive evidence of the protracted criminal episode, the State's closing argument, and the court's instructions which clearly authorized any one of several bases for finding the overt act element," there was no sufficiently substantial likelihood that the jury relied on the evidence of the abduction to establish the overt act element of the conspiracy charge. *Id.*

[20] Similarly, in the present case, the State in closing argument addressed the evidence that supported the conspiracy charge, directing the jury to evidence that Tunis performed a number of overt acts in furtherance of the agreement with Clark:

> Clark or Tunis made phone calls to each other. You heard that when you listen to the four jail phone calls. Clark and Tunis agreed to make Perry Baldridge sign[] a letter stating that Clark was innocent of all charges filed against him. You heard [Baldridge] testified [sic] to that and you saw the letter. Tunis made Baldridge sign the letter. Tunis made Baldridge order a notary to notarize said letter. Tunis and or Baldrige mailed said letter to Clark's mother's house. Clark submitted [the] letter as . . . discovery in pending criminal matter against Clark. We allege all of those different overt acts. *You only have to find that there was one overt act in this to find conspiracy to commit obstruction of justice.*

*Transcript Vol. 2* at 121 (emphasis added).

[21] In rebuttal argument, the State again addressed the conspiracy charge, and more specifically the overt acts performed in furtherance of the agreement. The

prosecutor quoted from statements made by Clark and Tunis in their phone calls, including that Tunis told Clark, "I made [Baldridge] sign it when he was on his visit[.]" *Transcript Vol. 2* at 124-25. Tunis bragged to Clark that, in getting Baldridge to sign the statement, Tunis had told him, "You sign it and I'm not going to do nothing to you but you don't sign and this is your ass." *Id.* at 125. Clark asked Tunis if Baldridge "wrote it up real good," and Tunis replied, "oh bro, I wrote it" and "[Baldridge] just signed it[.]" *Id.* at 126. Clark instructed Tunis that, in order "to make it legal," Baldridge "has to have it notarized[.]" *Id.* at 125. Tunis later assured Clark, "I got that done for you bro," explaining that although, at first, Baldridge "acted like he wasn't going to do it," Tunis "took [Baldridge's] head and slammed it into a . . . wall" at which time Baldridge agreed to get it notarized. *Id.* at 126. Clark instructed Tunis, "Send it to my mom . . . because I don't want it going to my house." *Id.* at 126. The State concluded by reminding the jury:

> Remember, conspiracy is just a plan between two or more people and they have to do at least one thing to put that plan in motion. Here we have evidence of many things to put the plan in motion.

*Id.* at 127.

[22] The State presented evidence of a variety of other overt acts in furtherance of the agreement, and the State reminded the jury in closing arguments that any one of these acts could support the conspiracy charge. The jury instruction regarding conspiracy likewise instructed the jury that the State must allege and prove that "that the defendant and or the other person performed *at least one*

overt act in furtherance of the agreement" and it, like the charging information, listed the various acts performed by Clark and/or Tunis. *Transcript* at 129 (emphasis added).

[23] Considering the charging information, jury instructions, and arguments of counsel, we do not find a reasonable possibility that the jury relied on the submission of the false letter in the criminal proceeding to establish the overt act element of the conspiracy charge. *See Redman*, 743 N.E.2d at 268. We hold that Clark's convictions on Counts II and III do not violate Indiana's Double Jeopardy Clause.

## III. Sentencing

[24] The trial court sentenced Clark to one and one-half years each on Count I, theft, Count II, conspiracy to commit obstruction of justice, and Count III, obstruction of justice, ordering Counts II and III served concurrently but consecutive to Count I. The trial court ordered that the habitual offender adjudication would enhance the sentence by four years, for an aggregate seven-year sentence. As Clark correctly observes, when defendants are convicted of multiple offenses and found to be habitual offenders, trial courts must impose the resulting penalty enhancement on only one of the convictions and must specify the conviction so enhanced. *Davis v. State*, 843 N.E.2d 65, 67 (Ind. Ct. App. 2006) (citing *McIntire v. State*, 717 N.E.2d 96, 102 (Ind. 1999)). Ind. Code § 35-50-2-8(j) provides that the trial court shall attach the habitual offender enhancement "to the felony conviction with the highest sentence imposed and

specify which felony count is being enhanced." Here, all of the sentences at issue were one and one-half years in length. Clark argues on appeal that the trial court failed to specify which felony was enhanced, or "at best the wording is vague." *Appellant's Brief* at 20. After review of the record before us, we agree.

[25] The trial court's sentencing order provided in relevant part:

> The Court imposes the following sentence:
>
> 1) Imposes a jail sentence of 1 1/2 years in Count I; 1 1/2 years in Count II, 1 1/2 years in Count III enhanced by fours [sic] (4) years on the Habitual count, all consecutive except Counts II and III are concurrent, all time executed in the Indiana Department of Corrections with credit for good time. Court recommends six (6) years executed in the Indiana Department of Corrections with the last year to be served at a level to be determined by the Tippecanoe County Community Corrections.

*Appellant's Appendix Vol. II* at 9. The State urges that the sentencing order reflects that the trial court enhanced the sentence on Count III. We, however, do not find that the trial court's order clearly specified the conviction that was being enhanced.

[26] The trial court's remarks at the sentencing hearing did not clarify the matter. There, the court stated:

> Counts two and three, conspiracy to commit obstruction of justice and obstruction of justice will run concurrently. But the theft, count one, counts two and three and of course the enhancement will the [sic] necessarily consecutive. So, one count one and a half years, on count two, one and a half years,

count three, one and a half years but again those two counts, two and three are to be concurrent but consecutive to the others, enhanced by four years.

*Transcript Vol. 2* at 160.

[27]   Additionally, we observe that the CCS incorrectly reflects that, Clark was sentenced to one year and 180 days on the habitual adjudication and to four years for obstruction of justice, rather than the reverse. We further note that the Abstract of Judgment in the record states that the habitual offender count was dismissed and Clark was found guilty on Count IV (intimidation charge), when in fact the reverse is what occurred. Because we are remanding for clarification of sentencing with regard to the habitual enhancement, we direct the trial court to also correct the Abstract of Judgment to make it consistent with the trial court's sentencing order.

[28]   We agree with Clark that the trial court did not adequately specify the conviction to which the habitual offender enhancement attached. Accordingly, we remand to the trial court with instructions to correct the sentence with regard to the habitual offender enhancement. *See Davis*, 843 N.E.2d at 67 (failure to specify conviction being enhanced requires remand for trial court to correct sentence).

[29]   Judgment affirmed and remanded with instructions.

Kirsch, J. and Vaidik, C.J., concur.