## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Ernest P. Galos
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Joseph McDonald, *Appellant-Defendant,* | October 15, 2015 |
| v. | Court of Appeals Case No. 71A04-1503-CR-108 |
| | Appeal from the St. Joseph Superior Court |
| State of Indiana, *Appellee-Plaintiff* | The Honorable John M. Marnocha |
| | Trial Court Cause No. 71D02-1409-F6-192 |

**Vaidik, Chief Judge.**

# Case Summary

[1] Joseph McDonald appeals from his two Level 6 convictions for residential entry and intimidation, raising three issues for our consideration. First, he contends that the trial court erred in violation of Indiana Evidence Rule 617 in denying his motion in limine and allowing the State to submit into evidence statements made by McDonald inside a police car but not recorded due to a malfunction of the motor vehicle recorder. Next, he argues that the trial court abused its discretion in failing to instruct the jury on Class A misdemeanor criminal trespass as a lesser-included offense of residential entry. Finally, he contends that the evidence is insufficient to support his intimidation conviction. Finding no merit to these contentions, we affirm McDonald's convictions.

# Facts and Procedural History

[2] Around 1:00 a.m. on September 21, 2014, Joseph McDonald entered the South Bend home of Jennifer Ward by removing the air-conditioning unit from her bedroom window and climbing in through the window. Ward was not home at the time, but was at the neighbor's house across the street taking a shower. Ward's daughter, Amberlene Hutton, and Hutton's girlfriend, Paris Wright—both of whom lived in Ward's house—were home and watching a movie in an upstairs bedroom. First, Hutton heard a loud knocking on the locked front door, which eventually stopped after a few minutes; she then heard a "tugging noise" followed by a "big bang, like something fell." Tr. p. 213. These sounds came from Ward's bedroom, located below Hutton's bedroom. Then, because

she heard footsteps inside the house, Hutton grabbed a rope wire and Wright grabbed a bat and they headed downstairs.

[3] Once downstairs, Hutton and Wright found Joseph McDonald walking through the house, talking to himself. McDonald had come to retrieve some personal belongings, such as clothing and bedding, which he had been storing at Ward's house for about a week. Hutton and Wright asked McDonald how he got into the house, and at first he did not respond. Finally he told Wright, "She know I'm here[,]" referring to Ward. *Id*. at 246. Hutton then ran across the street to the neighbor's house to get Ward.

[4] Ward heard banging on her neighbor's door. Hutton told her McDonald had broken into the house. Ward walked across the street toward her house and saw McDonald coming out the door of her house with a bag, carrying his things to his truck. Ward confronted McDonald, asking him, "Did you just break into my house?" *Id*. at 156. McDonald "kept saying something about [Ward] not answering the phone . . . he was calling [her] names." *Id*. Ward called 911, which "agitated him even more." *Id*. at 157.

> Q: Did he say anything?
>
> [Ward]: That was the second time that I heard him saying that if we called the police, we were all going to die, he was going to kill us. He was going back and forth, talking to himself, talking to me, yelling, he kept saying, "I just want to get my stuff." But in the same sentence of him wanting to take his things and leave in the same breath, "I'm going to pay you all for your hospitality,

but I'm going to kill you all." So we were a little bit confused at that point as to where his state of mind was.

*Id*. According to Wright, when he said he was going to kill them, he seemed "angry." *Id*. at 250. When Hutton was asked, "And was there anything said before he said he was going to kill you?" Hutton replied, "No, at this point my mom is going back and forth telling him she's calling the police, then this is what he's saying to us." *Id*. at 235.

[5] After he finished loading his things in his truck—a red, "rusty older pickup truck" with the passenger-side window "busted out" and plastic covering it— McDonald drove away with no headlights on. *Id*. at 162, 185. Ward telephoned the police and told them what direction he was driving. South Bend Police Department Officer Joy Phillips "heard the truck before [she] ever saw it" due to the truck's loud muffler. *Id*. at 185. Once she spotted the truck, Officer Phillips activated her overhead lights in an attempt to pull over the truck, but the truck didn't stop for several blocks.

[6] Several other police officers came to the scene, including Officer Samuel Chaput of the South Bend Police Department, who assisted with the stop. Officer Chaput's police car was equipped with a motor vehicle recorder ("Recorder"), which was supposed to be activated by the car's overhead lights. Officer Chaput had received training in the use of this MVR and would activate it every day before starting his shift to make sure it was working. After McDonald was stopped, Officer Chaput placed wrist restraints on McDonald and took him to his police car. Because Officer Chaput had activated his

overhead lights at the time of the stop, "to [his] knowledge [the Recorder] was still running, still recording" when he brought McDonald back to his police car. *Id*. at 291. Officer Chaput read McDonald his Miranda rights, which he waived, and then McDonald told the officer what had happened that night.

> He said that he had tried to contact Ms. Ward several times by calling her and texting her, to get his items back from her residence. He said that she never returned his calls, so he took it upon himself to go to the house, he took . . . the air conditioner out of the window, he went inside the house, grabbed his stuff and left.

*Id*. at 283. Later, Officer Chaput learned that his car's Recorder had in fact malfunctioned; therefore, McDonald's statements were not recorded and preserved.

[7] After taking McDonald to the St. Joseph County Jail, Officer Chaput went to Ward's house. He entered the house through the front door and spoke with Ward, Hutton, and Wright, who showed him the room where the air conditioning unit had been removed from the window. They then took Officer Chaput outside, where he observed the air-conditioning unit on the ground outside of the house. Officer Chaput did not think it was necessary to check the air-conditioning unit for fingerprints "because the suspect that we had said that he was the one that removed it." *Id*. at 294.

[8] The State charged McDonald with Level 6 felony residential entry and Level 6 felony intimidation. A jury trial was held in January 2015. At the beginning of the trial, McDonald filed a motion in limine requesting the trial court to

exclude testimony regarding statements made by McDonald while in police custody on the grounds that the statements were inadmissible in violation of Indiana Evidence Rule 617. The trial court denied the motion. At the conclusion of the trial, McDonald tendered a proposed jury instruction for criminal trespass, a Class A misdemeanor, as a lesser-included offense of residential entry. *See* Tr. p. 312-13; Appellant's App. p. 63. Finding that there was no serious evidentiary dispute as to the evidence of breaking as an element of residential entry, the trial court refused the instruction.

The jury found McDonald guilty of Level 6 felony residential entry and Level 6 felony intimidation. McDonald now appeals his convictions.

# Discussion and Decision

## 1. Evidence Rule 617

First McDonald alleges that the trial court erred in violation of Indiana Evidence Rule 617 in denying his motion in limine and allowing the State to submit into evidence statements made by McDonald inside a police car but not recorded due to a malfunction of the Recorder. A trial court has broad discretion to admit or exclude evidence. *Blount v. State*, 22 N.E.3d 559, 564 (Ind. 2014). We therefore disturb its ruling only if it amounts to an abuse of discretion, meaning the court's decision is clearly against the logic and effect of the facts and circumstances or it is a misinterpretation of the law. *Id.* We do not reweigh the evidence and consider the evidence most favorable to the trial

court's ruling. *Robey v. State*, 7 N.E.3d 371, 379 (Ind. Ct. App. 2014), *trans. denied*.

[11]  Indiana Evidence Rule 617 - Unrecorded Statements During Custodial Interrogation provides in relevant part as follows:

> (a) In a felony criminal prosecution, evidence of a statement made by a person during a Custodial Interrogation in a Place of Detention shall not be admitted against the person unless an Electronic Recording of the statement was made, preserved, and is available at trial, except upon clear and convincing proof of any one of the following:
>
> * * * * *
>
> (3) The law enforcement officers conducting the Custodial Interrogation in good faith failed to make an Electronic Recording because the officers inadvertently failed to operate the recording equipment properly, or without the knowledge of any of said officers the recording equipment malfunctioned or stopped operating [] . . .
>
> (b) For purposes of this rule, . . . "Place of Detention" means a jail, law enforcement agency station house, or any other stationary or mobile building owned or operated by a law enforcement agency at which persons are detained in connection with criminal investigations.

[12]  Here, McDonald asserts that "A reasonable interpretation of [Evidence Rule] 617 is that any place of detention operated by law enforcement that is equipped with recording equipment is covered by the rule." Appellee's Br. p. 17. Thus he contends that the trial court erred in admitting any statements he made while

inside the police car because – due to the malfunctioning Recorder – no electronic recording of his statements was made and preserved.

[13] But McDonald's argument is problematic for at least two reasons. First, Rule 617 doesn't apply in this situation because a police car is not a Place of Detention as defined by the rule. McDonald urges us to expand the definition, however, writing that a "reasonable interpretation of [Rule] 617 is that *any* place of detention operated by law enforcement that is equipped with recording equipment is covered by the rule." Appellant's Br. p. 17 (emphasis added). But given that police car is not included in the specific list of items in the definition of Place of Detention – a jail, law enforcement agency station house, or any other stationary or mobile *building* owned or operated by a law enforcement agency – we find that the definition does not include police car, and thus Rule 617 does not apply.

[14] Even if Rule 617 did apply, the situation before us falls within a clear exception to the rule that unrecorded statements made during a custodial interrogation in a Place of Detention are inadmissible. This exception states that unrecorded statements are not inadmissible if the law enforcement officer in good faith failed to make an Electronic Recording because of the officer's inadvertent failure to operate the recording equipment properly, or because the equipment malfunctioned without the officer's knowledge. *See* Evid. R. 617(a)(3). Officer Chaput testified at trial that he believed the MVR was activated when he turned on his overhead lights at the time of the stop, and he believed that it was still recording when he brought McDonald back to his car: "To my knowledge it

was still running, still recording." Tr. p. 291. In other words, there is clear and convincing evidence that Officer Chaput in good faith failed to make an electronic recording because the recording equipment stopped working without his knowledge. *See* Evid. R. 617(a)(3).

[15] We find that the trial court did not abuse its discretion in denying McDonald's motion in limine and admitting into evidence unrecorded statements made by McDonald in Officer Chaput's police car.

## 2. Jury Instruction on Criminal Trespass

[16] Next McDonald contends that the trial court abused its discretion in refusing his jury instruction on Class A misdemeanor criminal trespass as a lesser-included offense of residential entry. When a defendant requests a lesser-included offense instruction, the trial court must apply the three-part analysis set forth in *Wright v. State,* 658 N.E.2d 563 (Ind. 1995). *Hamilton v. State*, 783 N.E.2d 1266, 1268 (Ind. Ct. App. 2003), *trans. denied*. The first two parts require the trial court to determine whether the offense is either inherently or factually included in the charged offense. *Id*. If so, then the trial court proceeds to the final part, which requires the trial court to determine whether there is a serious evidentiary dispute regarding any element that distinguishes the two offenses. *Id*. In deference to the trial court's proximity to the evidence, we review a decision whether to instruct the jury on lesser-included offenses for an abuse of discretion if the court makes a finding as to the existence or lack of a serious evidentiary dispute. *Id*. Here, the trial court in denying McDonald's

request for a jury instruction on criminal trespass found that there was no evidentiary dispute as to whether McDonald entered Ward's home through the window after removing the air conditioner as opposed to some other way. *See* Tr. p. 313 ("There is no . . . evidentiary dispute as to whether Mr. McDonald entered the home through this method or any other method."). We therefore review the trial court's refusal to give McDonald's criminal-trespass instruction for an abuse of discretion. *See Hamilton*, 783 N.E.2d at 1268-69.

[17] This Court has already determined that criminal trespass is not an inherently lesser-included offense of residential entry. *Higgins v. State*, 783 N.E.2d 1180, 1187 (Ind. Ct. App. 2003) ("[C]riminal trespass contains materially different elements that must be proven that are not found in the residential entry statute: for criminal trespass, the lack of a contractual interest in the property must be proven, as well as the owner's lack of consent to the entry, neither of which need be proven for residential entry. Additionally, the two crimes do not differ solely in terms of the requisite level of culpability; both require a mens rea of knowingly or intentionally."), *trans. denied*. But criminal trespass can be a *factually* included lesser offense of residential entry if the charging instrument alleges that the means used to commit the crime charged include all of the elements of the alleged lesser-included offense. *Young v. State*, 846 N.E.2d 1060, 1062 (Ind. Ct. App. 2006). To determine whether an alleged lesser-included offense is factually included in the crime charged, the trial court must compare the statute that defines the alleged lesser-included offense with the charging instrument in the case. *Wright*, 658 N.E.2d at 567. If the charging instrument

alleges that the means used to commit the crime charged include all of the elements of the alleged lesser-included offense, then the alleged lesser-included offense is factually included in the crime charged. *Id*. at 566–67.

[18]   In the present case, McDonald was charged with residential entry, a Level 6 felony, as follows:

> On or about September 21, 2014 in St. Joseph County, State of Indiana, Joseph Terry McDonald did knowingly or intentionally break and enter the dwelling of Jennifer L. Ward and/or Amberlene Hutton, located at [] W. Elwood Avenue, South Bend, Indiana.

Appellant's App. p. 127. The crime of Class A misdemeanor criminal trespass is defined by Indiana Code section 35-43-2-2(b)(5)(B) in relevant part as follows:

> A person who[,] . . . not having a contractual interest in the property, knowingly or intentionally enters the . . . dwelling of another person without the person's consent . . . commits criminal trespass . . . .

[19]   In *Higgins*, this Court concluded that criminal trespass was a factually included lesser offense of residential entry where—as here—the State had alleged that Higgins did knowingly "break and enter" the victim's dwelling. *See Higgins*, 783 N.E.2d at 1189 (relying on a case by our Supreme Court, *J.M. v. State*, 783 N.E.2d 703, 705 (Ind. 2000), in which that Court found that by charging that J.M. did knowingly or intentionally "break and enter" the residence of another person, the State had sufficiently alleged facts constituting criminal trespass,

even though the charging information did not specifically allege that J.M. had committed the entry "without consent.").

[20] Assuming, then, that criminal trespass *is* a factually included lesser offense of residential entry given the charging information in this case, we proceed to the third and final step of the *Wright* test: whether there is a "serious evidentiary dispute about the element or elements distinguishing the greater from the lesser offense" such that a jury could conclude that the lesser offense was committed but not the greater. *Wright*, 658 N.E.2d at 567. The key distinction between the two offenses at issue here is the element of *breaking* and entering required for residential entry but not for criminal trespass. *See* Ind. Code § 35-43-2-1.5 ("A person who knowingly or intentionally breaks and enters the dwelling of another person commits residential entry, a Level 6 felony.").

[21] In this case, there is no serious evidentiary dispute as to whether McDonald broke into Ward's house.[1] Indeed, "[a]ll of the evidence points to a breaking." *See Higgins*, 783 N.E.2d at 1189. The record shows that Ward's daughter, Hutton, was in an upstairs bedroom of the house watching a movie when she heard, first, a loud knocking on the locked front door which stopped after a few minutes, and then a "tugging noise" followed by a "big bang, like something fell." Tr. p. 213. These sounds came from Ward's bedroom, located below

---

[1] McDonald essentially concedes the lack of an evidentiary dispute in his appellate brief, writing, "Admittedly, Officer Chaput's testimony that [McDonald] made a statement to him about pulling out the air conditioner and entering though the window was damaging to [McDonald]." Appellant's Br. p. 14-15.

Hutton's bedroom. Then, because she heard footsteps inside the house, Hutton and her girlfriend Wright went downstairs and found McDonald walking through the house, talking to himself, collecting bags of things he had been storing in Ward's house. After Ward called the police, McDonald was stopped and taken into Officer Chaput's police car, where he told the officer that he had tried to contact Ward several times by calling her and texting her, because he wanted to get his things from her house, but when she didn't answer or return his calls, "he took it upon himself to go to the house, he took . . . the air conditioner out of the window, he went inside the house, grabbed his stuff and left." *Id*. at 283. After taking McDonald to jail, Officer Chaput went to Ward's house and observed firsthand the air-conditioning unit that had been removed from the window on the ground outside of her house.

[22] Because there was no serious evidentiary dispute as to whether McDonald broke into Ward's house, we find that the trial court did not abuse its discretion in refusing to give McDonald's jury instruction on the lesser-included offense of Class A misdemeanor criminal trespass.

## 3. Insufficiency of the Evidence

[23] Finally, McDonald argues that the evidence is insufficient to support his intimidation conviction. Our standard of reviewing claims of sufficiency of the evidence is well settled. When reviewing the sufficiency of the evidence, we consider only the probative evidence and reasonable inferences supporting the verdict. *Boggs v. State*, 928 N.E.2d 855, 864 (Ind. Ct. App. 2010), *trans. denied*.

We do not reweigh the evidence or assess witness credibility. *Id.* We consider conflicting evidence most favorably to the trial court's ruling. *Id.* We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.* It is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Id.* The evidence is sufficient if an inference may be reasonably drawn from it to support the verdict. *Id.* A conviction may be based upon circumstantial evidence alone. *Id.*

[24] In order to convict McDonald of Intimidation as a Level 6 felony, the State was required to prove beyond a reasonable doubt that he communicated a threat to Ward with the intent that Ward engage in conduct against her will and that the threat was to commit a forcible felony. *See* Ind. Code § 35-45-2-1. Whether a person operated with the requisite intent to force another to engage in conduct against his will depends on the facts and circumstances of the case. *Williams v. State*, 677 N.E.2d 1077, 1083 (Ind. Ct. App. 1997). The question is one of fact for the jury to decide. *Id.*

[25] In the present case, the evidence at trial showed that after Hutton came to the neighbor's house across the street to tell Ward that McDonald was there, Ward went across the street to confront him, and she asked him if he had broken into her house. Ward testified that when she tried to call 911 with her cell phone, "that agitated him even more." Tr. p. 157. Ward went on to testify:

> That was the second time that I heard him saying that if we called the police, we were all going to die, he was going to kill us.

He was going back and forth, talking to himself, talking to me, yelling, he kept saying, "I just want to get my stuff." But in the same sentence of him wanting to take his things and leave in the same breath, "I'm going to pay you all for your hospitality, but I'm going to kill you all." So we were a little bit confused at that point as to where his state of mind was.

*Id.* When he said he was going to kill them, he seemed "angry." *Id.* at 250. In response to the question, "And was there anything said before he said he was going to kill you?" Hutton replied, "No, at this point my mom is going back and forth telling him she's calling the police, then this is what he's saying to us." *Id.* at 235. This evidence shows that McDonald threatened to kill Ward with the intent that she refrain from calling 911. We find the evidence is sufficient to support McDonald's conviction for Level 6 felony intimidation.

[26]  Affirmed.

Robb, J., and Pyle, J., concur.